Cliff Fonstein
Eric G. Hoffman
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
cfonstein@sidley.com
eghoffman@sidley.com

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JUN 1 0 2010 ★

BROOKLYN OFFICE

Attorneys for Defendant Tribune ND, Inc.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GERARD SCHULTZ,

        Plaintiff,

      v.

TRIBUNE ND, INC. f/k/a NEWSDAY, INC.,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -

CV 10 - 2652

**NOTICE OF REMOVAL**

**BIANCO, J.**

BOYLE, M.J.

TO:    United States District Court for the Eastern District of New York:

Pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, Defendant Tribune ND, Inc., formerly known as Newsday, Inc. ("Defendant" or "Newsday"), with full reservation of all defenses, files this Notice of Removal of this civil action from the Supreme Court of the State of New York, County of Suffolk, to the United States District Court for the Eastern District of New York and states as follows:

    1.    Newsday is a named defendant to the action in the Supreme Court of the State of New York, Suffolk County, bearing the caption <u>Gerard Schultz v. Newsday, Inc.</u>, Index No. 13469/10, filed on April 8, 2010.

2.      Plaintiff served a Summons and Complaint, annexed hereto as Exhibit 1, on Newsday on or about May 14, 2010, and subsequently served an Amended Complaint on June 3, 2010, annexed hereto as Exhibit 2.

## **GROUNDS FOR REMOVAL**

3.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's sole cause of action arises under Federal law.

4.      While Plaintiff purports to allege a violation of the New York State Human Rights Law's proscription against disability discrimination, he asserts that "[t]he sole reason that Newsday terminated plaintiff['s employment] . . . was to prevent him . . . from receiving short term disability benefits for twenty six (26) weeks and long term disability benefits thereafter for life," (Compl. ¶ 23; Am. Compl. ¶ 24), and, similarly, that Newsday terminated his employment "solely . . . in order to deprive him of his short term and long term disability benefits." (Compl. ¶ 24; Am. Compl. ¶ 25.)

5.      The long-term disability benefits referred to in Plaintiff's Complaint as the "sole" motivation for Plaintiff's termination of employment were part of a plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). (See Compl. Exh C.; Am. Compl. Exh. C at pp. 15-16 (copy of benefit plan, referring to ERISA).)

6.      Because Plaintiff's first cause of action is premised on the allegation that he was terminated "solely . . . in order to deprive him of" an ERISA benefit, that claim duplicates a claim under Section 510 of ERISA, 29 U.S.C. § 1140. Accordingly, the claim is completely preempted by ERISA Section 510 and the civil enforcement provision of ERISA, Section 502(a), 29 U.S.C. §§ 1132(a), and is, for purposes of removal, a claim under Federal law. See Ross v. Liberty Mut. Ins. Co., 172 Fed. App'x 346, 346 (2d Cir. 2006) (summary order) ("Any state

2

cause of action that 'duplicates, supplements, or supplants' the civil enforcement remedies of [ERISA], is completely preempted by Congress and, therefore, removable without regard to the wording of the complaint.") (quoting <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 209 (2004)); <u>Estate of Gottesman v. Verizon New York, Inc.</u>, No. 09-CV-667 (JG)(RLM), 2009 WL 928311 at *5-6 (E.D.N.Y. Apr. 6, 2009) (same); <u>see also</u> <u>Ingersoll-Rand Co. v. McClendon</u>, 498 U.S. 133 (1990) (dismissing employee's state law wrongful discharge claim based on allegation that his discharge was based on his employer's desire to avoid making contributions to his pension fund, because claims that "purport [] to provide a remedy for the violation of a right expressly guaranteed by [ERISA]" are preempted by ERISA).

## PROCEDURAL REQUIREMENTS FOR REMOVAL

7.     The Summons and Complaint, annexed hereto as Exhibit 1, was served at the offices of Newsday, LLC in Melville, New York on May 14, 2010.

8.     No other process, pleading or order has been served on Defendant in this action.

9.     Defendant has not answered or moved with respect to the Complaint or the Amended Complaint, and its time to do so has not yet expired.

10.     Removal of this case to this Court is timely. Pursuant to 28 U.S.C. § 1446(b), a Notice of Removal must be filed within 30 days of the service of a copy of the initial pleading setting forth the claims for relief upon which the action is based. <u>See</u> <u>Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.</u>, 526 U.S. 344, 354 (1999) (holding that the thirty day time period under removal statute begins to run from the date of formal service).

11.     The United States District Court for the Eastern District of New York embraces the county in which the state court action is now pending and thus this Court is a proper venue for this action pursuant to 28 U.S.C. § 81(b)(1) and 1441(a). A related action among these same

parties, <u>Schultz v. Tribune Company, Inc., et al.</u>, Case No. 06-Civ-4800 (FB)(RER), was previously litigated in the Brooklyn Office of this District before the Honorable Senior District Judge Frederic Block.

12.  Defendant is filing written notice of this removal with the Clerk of the State Court in which the action is currently pending pursuant to 28 U.S.C. § 1446(d).  Copies of the Notice of Filing of Notice of Removal together with a copy of this Notice of Removal are being served upon Plaintiff's counsel pursuant to 28 U.S.C. § 1446(d).

13.  If any question arises as to the propriety of the removal of this action, Defendant requests the opportunity to present a brief and oral argument in support of its position that this case is removable, and to conduct jurisdictional discovery, if needed.

WHEREFORE, Defendant respectfully removes this action from the Supreme Court for the State of New York, Suffolk County, bearing the Index Number case 13469/10, to this Court, pursuant to 28 U.S.C. § 1441.

Dated: New York, New York
June 10, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP

By: _____
Cliff Fonstein
Eric G. Hoffman
787 Seventh Avenue
New York, NY  10019
(212) 839-5300
cfonstein@sidley.com
eghoffman@sidley.com

Attorneys for Defendant Tribune ND, Inc.

Exhibit 1



# Civil Court Minutes Report

**Index #:** 10 13469

**Print Date:** 5/18/2010

**Court:** S          **Case Type:**                    **Application Date:** 08-April-2010

**Plaintiff(s)**

SCHULTZ, GERARD

**Defendant(s):**

NEWDAY, INC.

**Minutes :**

| Seq # | Process Date | Minutes | Type | Notation |
|-------|--------------|---------|------|----------|
| 1 | 08-Apr-2010 | SUMMONS & COMPLAINT | | VER |
| 2 | 08-Apr-2010 | EXHIBITS | | |
| | | Total Minute Records :2 | | |

**Notations :**

| Minute | Seq | Liber | Page | LP No | Notation |
|--------|-----|-------|------|-------|----------|
| | | | Total Notation Records :0 | | |

**Tax Map Info :**

| Minute | Seq | Tax Map Number |
|--------|-----|----------------|
| | Total Tax Map Records :0 | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
-------------------------------------------X

GERARD SCHULTZ,

                    Plaintiff,

         -against-

NEWSDAY, INC.,

                Defendants.

-------------------------------------------X

Index No.:  10 13469

Date of Filing:

Plaintiff Designates
Suffolk County as the
Place of Trial

**SUMMONS**
The Basis of Venue is
Plaintiff's Place of
Residence

Plaintiff's address:
66 Grasslands Circle
Mt. Sinai, NY 11766

To the above named defendant (S):

    YOU ARE HEREBY SUMMONED to answer the complaint in this
action and to serve a copy of your answer, or, if the complaint is
not served with this summons, to serve a notice of appearance, on
the Plaintiffs Attorney(s) within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days
after the service is complete if this summons is not personally
delivered to you within the State of New York); and in case of
your failure to appear or answer, judgment will be taken against
you by default for the relief demanded herein.

Dated: Queens, New York
     April 6, 2010

GIAIMO ASSOCIATES, LLP
Attorneys for Plaintiff
80-02 Kew Gardens Road
Kew Gardens, New York 11415
(718) 261-6200

<u>Defendant's Address</u>:

Newsday, Inc.
235 Pinelawn Road
Melville, N.Y. 11747

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
---------------------------------------X
GERARD SCHULTZ,

                                        Index No.:

        Plaintiff,

                                        VERIFIED COMPLAINT

   -against-

NEWSDAY, INC.,

        Defendant.
---------------------------------------X

Plaintiff, GERARD SCHULTZ, by his attorneys Giaimo
Associates, LLP, as and for his Verified Complaint herein
alleges, upon information and belief, as follows:

1.   At all times hereinafter mentioned, plaintiff Gerard
Schultz is and was a resident of the County of Suffolk, State of
New York.

2.   At all times hereinafter mentioned, defendant Newsday,
Inc. ("Newsday") is and was a corporation duly organized and
existing under and by virtue of the laws of the State of New York
with a principal office in the County of Suffolk, State of New
York and a publisher and distributor and/or co-publisher and co-
distributor of "Newsday" newspaper.

3.   At all times hereinafter mentioned, Tribune Company,
Inc. is and was a corporation duly organized and existing under
and by virtue of the laws of the State of Illinois, and duly
authorized to conduct business within the State of New York and
formerly the owner of Newsday, and is presently in bankruptcy

pursuant to Chapter 11 of the Federal Bankruptcy laws. Newsday and Tribune are hereinafter collectively referred to as "Newsday".

4.    At all times hereinafter mentioned, Newsday was an employer who employed plaintiff within the meaning of New York State Executive Law §292 ("Human Rights Law").

5.    At all times hereinafter mentioned, plaintiff was employed by Newsday from in or about 1980 until his termination therefrom as hereinafter described.

6.    In or about July 1980 plaintiff was hired by Newsday as a truck helper and during his employment was promoted to various positions within Newsday, such as road foreman and assistant foreman of night operations. In or about 1996 plaintiff was promoted to Sales Manager of Long Island Single Copy Sales and was paid an annual salary of eighty one thousand ($81,000.00) dollars.

7.    On or about January 19, 2001, plaintiff was in an automobile accident ("accident') unrelated to his employment in which he suffered severe injury to his back resulting specifically, in spondylolysis and anterolisthesis with arthritic degeneration.

8.    One week after his accident, on or about January 26, 2001, plaintiff returned to work his job at Newsday and resumed

2

his normal employment activities notwithstanding his serious injuries resulting from the accident.

9.    On or about May 29, 2002, plaintiff was required to undergo spinal surgery to correct his injuries and was not able to return to work following such surgery until on or about November 1, 2002 when he resumed his normal employment duties and activities notwithstanding the continued pain resulting from his back injury.

10.   Notwithstanding the injuries from the accident, at no time during the course of plaintiff's employment from 1980 up until the time of his termination by Newsday as hereinafter described was plaintiff accused or notified by Newsday that he was not satisfactorily performing his job related duties.

11.   On or about August 9, 2004, plaintiff was required to undergo a second corrective spinal surgery for the injuries he suffered in his accident. As a result, he was required to take medical leave from his employment from August 9, 2004 to February 24, 2005 ("short term medical leave") and permanent disability ("long term medical leave").

12.   In a decision dated July 26, 2006, the Social Security Administration held that plaintiff became permanently disabled on July 31, 2004. A copy of the decision is annexed hereto as Exhibit "A" and made a part hereof and to which this Court is

3

respectfully referred for the full force, tenor and effect thereof.

13. On or about September 2, 2004, while on short term medical leave, Newsday without cause, wrongfully terminated plaintiff from his employment for the reasons set forth in a termination letter from Newsday, annexed hereto as Exhibit "B" and made a part hereof, to which this Court is respectfully referred for the full force, tenor and effect thereof, and which provides in part:

> I am writing to confirm the termination of your employment with Newsday effective September 2, 2004. As you were advised yesterday, the reasons for your termination are based on your participation in fraudulent circulation practices, your failure to be forthright with company attorneys during the investigation, and your violations of the company's Code of Conduct.

14. Under the terms of Newsday's Disability Plans Summary Plan Description ("Disability Plan") to which plaintiff was subject, plaintiff was entitled to receive his full salary while on short term disability beginning on or about August 18, 2004 and for twenty six (26) weeks thereafter i.e. until on or about February 24, 2005. A copy of the Disability Plan is annexed hereto as Exhibit "C" and made a part hereof, to which this Court is respectfully referred for the full force, tenor and effect thereof.

4

15. Under the Disability Plan after the expiration of the twenty six (26) week short term disability period plaintiff was entitled to receive long term disability benefits if totally disabled, for the balance of his life.

16. By letter dated October 5, 2004, a copy of which is annexed hereto as Exhibit "D" and made a part hereof, plaintiff's attorney affirmed that notwithstanding his wrongful termination as hereinafter described, plaintiff had the right under the Disability Plan to continue to receive short term disability benefits.

17. By letter dated October 26, 2004, a copy of which is annexed hereto as Exhibit "E" and made a part hereof, Newsday notified plaintiff that it would terminate plaintiff's short term disability benefits.

18. Notwithstanding Newsday's allegation in its termination letter of September 3, 2004 that plaintiff was terminated for allegedly participating in Newsday's fraudulent circulation practices; failing to be forthright with Newsday's attorneys during its investigation of Newsday; and, for violation of Newsday's Code of Conduct, plaintiff was unlawfully terminated as the allegations in the termination letter were untrue, wrongful, fraudulent and made with the fraudulent intent of terminating plaintiff's employment while on disability and terminating plaintiff's disability benefits.

19. In truth and in fact plaintiff was never called or subpoenaed by the U.S. Attorney and was never accused of fraud or to have participated "in fraudulent circulation practices;" and, if plaintiff had done so, and Newsday's attorneys had a suspicion that he had done so the U.S. Attorney who prosecuted Newsday for its fraudulent circulation practices would have immediately notified plaintiff and Newsday.

20. In addition, plaintiff was absolutely truthful in his interviews with Newsday's attorneys during their investigation into Newsday's fraudulent circulation practices and answered each of the questions directed to him despite his fear that Newsday's managers and attorneys were attempting to set him up as a participant in Newsday's fraudulent.

21. In addition, plaintiff has never engaged in wrongful conduct while employed by Newsday in violation of Newsday's Code of Conduct which reads in pertinent part as follows:

> Employees should talk to supervisors, managers or other appropriate personnel about observed illegal or unethical behavior and when in doubt about the best course of action in a particular situation. It is the policy of the Company not to allow retaliation for reports of misconduct by others made in good faith by employees. Employees are expected to cooperate in internal investigations of misconduct. (Emphasis added.)

22. In truth and in fact and to the knowledge of Newsday plaintiff did during the course of his employment observe illegal

6

and unethical behavior by Newsday employees and did oppose such behavior, and did report it to his superiors, notwithstanding their threats of retaliation and termination.

23. The sole reason that Newsday terminated plaintiff while he was on disability and not found to have participated in fraudulent conduct was to prevent him while disabled from receiving short term disability benefits for twenty six (26) weeks and long term disability benefits thereafter for life.

24. Newsday discriminated against plaintiff by terminating him solely because of his absence from employment while on disability in order to deprive him of his short term and long term disability benefits.

25. As a result of the foregoing, Newsday has violated Human Rights Law §296(1)(a) which reads as follows:

> 1. It shall be an unlawful discriminatory practice:
> (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. (Emphasis added.)

26. Plaintiff is and has been since July 31, 2004 totally disabled from employment.

7

27. If plaintiff had not been wrongfully terminated he was and would have been entitled to $1,332.66 a week while on short term disability and $934.60 a week while on long term disability, plus additional benefits including but not limited to health insurance, dental coverage, life insurance, pension benefit plan and employee stock option plan until the present time.

28. By reason of Newsday's unlawful discriminatory practices, plaintiff has been damaged in the sum of one million six hundred thousand ($1,600,000.00) dollars and lawful interest thereon.

## AS AND FOR A SECOND CAUSE OF ACTION

29. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "28" hereof as though the same were set forth at length herein.

30. By reason of the foregoing Newsday has deprived plaintiff of his right to due process of law in violation of Article VI of the Constitution of the State of New York and the Fourteenth Amendment to the United States Constitution.

31. By reason of the foregoing, plaintiff has been damaged in the amount of one million six hundred thousand ($1,600,000.00) dollars and lawful interest thereon.

## AS AND FOR A THIRD CAUSE OF ACTION

8

32. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "31" hereof as though the same were set forth at length herein.

33. By wrongfully terminating plaintiff as aforesaid, Newsday acted knowingly, intentionally, wantonly and maliciously, and without regard to the rights of plaintiff and subjected plaintiff to cruel and unjust hardship in addition to monetary loss.

34. By reason of the foregoing, malicious and wanton conduct by Newsday, plaintiff is entitled to punitive damages in the amount of five million ($5,000,000.00) dollars.

WHEREFORE plaintiff demands judgment as follows:

(a) As to the first cause of action damages in the amount of one million six hundred thousand ($1,600,000.00) dollars;

(b) As to the second cause of action damages in the amount of one million six hundred thousand ($1,600,000.00) dollars;

(c) As to the third cause of action punitive damages in the amount of five million ($5,000,000.00) dollars; and

(c) For such other and further relief as to this Court may seem just and proper together with the costs and disbursements of this action.

Dated: Queens, New York
April 6, 2010

Giaimo Associates, LLP

9

Attorneys for Plaintiff
80-02 Kew Gardens Road
Kew Gardens, N.Y. 11415
(718)261-6200

10

**Exhibit A**

NOTICE TO PROCESSING CENTER
FURTHER ACTION NECESSARY

## SOCIAL SECURITY ADMINISTRATION
### Office of Disability Adjudication and Review

### DECISION

**IN THE CASE OF**

**CLAIM FOR**

Period of Disability and
Disability Insurance Benefits

Gerard E. Schultz
(Claimant)

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
(Social Security Number)

(Wage Earner)

On October 25, 2004, the claimant filed an application for a period of disability and disability insurance benefits. The claim was denied initially and a request for hearing was timely filed. To adjudicate this matter, a hearing was held in Jericho, New York, on July 25, 2006. The claimant appeared at the hearing, represented by Michael T. Sullivan, Esq. Also present at the hearing was Dr. Jody Greenfield, who testified in his capacity as a medical expert.

### ISSUES

The issue in this case concerns whether the claimant is entitled to a period of disability and disability insurance benefits under sections 216(i) and 223 of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

### EVALUATION OF THE EVIDENCE

The claimant alleges disability beginning on July 31, 2004 due to a back impairment. He is a forty-six year old individual with two years of college education and skilled, sedentary past relevant work experience as a manager. He met the insured status requirements of the Social Security Act on July 31, 2004, the date he alleged that he became unable to work, and continues to meet them until December 31, 2008. He has not engaged in substantial gainful activity at any time since July 31, 2004, the date he alleges his disability began.

The claimant has medically determinable severe impairments consisting of lumbar disc disease and radiculopathy and status post lumbar fusion. He does not have an impairment, or combination of impairments, that meets or equals the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. A determination must be made as to whether he retains the residual functional capacity to perform the requirements of his past relevant work or can adjust to other work.

CONFIDENTIAL

SK 0030

Dr. Greenfield reviewed all of the medical evidence and testified that he claimant has a long history of low back pain due to a motor vehicle accident in 2001 (Exhibit 1F). The claimant has been under the care of Dr. James Farmer, a spinal surgeon, since April 2002 (Exhibit 6F). In May 2002, he underwent lumbar fusion surgery and continued to have pain with prolonged sitting and standing (Exhibit 4F). The claimant stopped work in July 2004 and underwent IDET procedure in August 2004. He is considering repeat surgery. Citing Exhibits 11F and 14F, Dr. Greenfield testified that has clinical signs including low back pain radiating to the buttocks with numbness and limited range of motion. EMG testing revealed chronic right L4-5 radiculopathy (Exhibit 15F, page 4). MRI of the lumbar spine showed facet arthrosis at L1-2 to L4-5 and spondylolisthesis at L5-S1 (Exhibit 15F, page 4). In an assessment dated June 27, 2006, Dr. Farmer reported that the claimant's symptoms limited his ability to function and opined that he could lift and carry ten pounds, sit for three hours in an eight-hour workday and stand and walk for three hours in an eight-hour workday (Exhibit 14F). Similar findings were reported by the orthopedic consultative examiner that the claimant has marked limitations in standing, lifting and prolonged sitting (Exhibit 11F). The claimant's signs and symptoms have not improved despite surgery and pain management including an IDET procedure (Exhibit 12F, page 114). In the opinion of the medical expert, the claimant has a reduced residual functional capacity for lifting and carrying up to ten pounds, standing and walking for three hours in an eight-hour workday and sitting for three hours in an eight-hour workday.

The Administrative Law Judge has considered the medical opinions of record. Great weight has been accorded Dr. Greenfield's opinion as he is a board-certified internist familiar with Social Security Administration Law and Regulations, he reviewed the entire medical record, and he expressed an opinion that is well-supported by medical findings. Similarly, less weight has been given to the state agency review physician's opinion that the claimant is capable of performing sedentary work as this physician never examined the claimant and his opinion is inconsistent with the overall medical record (Exhibit 10F).

The Administrative Law Judge has also considered the claimant's statements regarding his condition and inability to work. The Administrative Law Judge finds the claimant's statements credible as he suffers from an impairment which can reasonably be expected to produce the symptoms he alleged (Social Security Ruling 96-7p).

Based on all the evidence and the testimony of the medical expert, the undersigned concludes that the claimant has the residual functional capacity to lift and carry ten pounds, sit for three hours in an eight-hour workday and stand and walk for three hours in an eight-hour workday. In his former work as a manager, he was required to perform job demands far in excess of his current abilities. As he has demonstrated that he lacks the residual functional capacity to perform the requirements of any past relevant work, the burden shifts to the Social Security Administration to show that there are other jobs that the claimant can perform. This determination is made in conjunction with the medical-vocational guidelines of 20 C.F.R. Part 404, Subpart P, Appendix 2. The claimant's exertional limitations materially compromise his remaining occupational base to the extent that he cannot perform any alternative substantial gainful activity existing in significant numbers in the national economy. In accordance with a

finding that the claimant has been under a disability beginning July 31, 2004, he is entitled to disability insurance benefits on the basis of his application filed on October 25, 2004.

## FINDINGS

After careful consideration of the entire record, the undersigned makes the following findings:

1. The claimant met the insured status requirements of the Social Security Act on July 31, 2004, the date he became unable to work, and continues to meet them until December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since July 31, 2004.

3. The medical record establishes the presence of severe impairments consisting of lumbar disc disease and radiculopathy and status post lumbar fusion.

4. The claimant does not have an impairment, or combination of impairments, that meets or equals the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant's statements regarding his conditions and inability to work are credible.

6. The claimant has the residual functional capacity to lift and carry ten pounds, sit for three hours in an eight-hour workday and stand and walk for three hours in an eight-hour workday.

7. The claimant cannot perform the job demands of his former work as a manager.

8. The claimant is forty-six years old with two years of college education and skilled work experience.

9. The claimant's exertional limitations materially compromise his remaining occupational base to the extent that he cannot perform any alternative substantial gainful activity existing in significant numbers in the national economy.

10. The claimant has been disabled since July 31, 2004.

CONFIDENTIAL

## DECISION

It is the decision of the Administrative Law Judge that, based on the application filed on October 25, 2004, the claimant is entitled to a period of disability commencing July 31, 2004 and to disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act.

Joseph Halpern
Administrative Law Judge

Date

CONFIDENTIAL

SK 0033



**Exhibit B**



**A TRIBUNE PUBLISHING COMPANY**

235 Pinelawn Road
Melville, New York 11747
tel: 631/843-3485
fax 631/843-5218
katie.lawler@newsday.com

September 3, 2004

Katie Lawler
Vice President, Human Resources
and Labor Relations

## VIA OVERNIGHT MAIL

Mr. Gerry Schultz
66 Grasslands Circle
Mt. Sinai, NY 11766

Re: Status of Employment

Dear Gerry:

I am writing to confirm the termination of your employment with Newsday effective September 2, 2004. As you were advised yesterday, the reasons for your termination are based on your participation in fraudulent circulation practices, your failure to be forthright with company attorneys during the investigation, and your violations of the company's Code of Conduct.

I have enclosed two checks from Prudential representing the state disability benefits portion of the disability pay from August 16 through September 5 (totaling $675.00). Please note that your disability pay has been approved through September 23, 2004 (see enclosed letter sent to you from Prudential).

The Tribune Benefit Service Center will be forwarding information to you regarding the status of your benefits, including your retirement benefits (pension and 401(k)). You can contact the Benefit Service Center directly at 1-800-872-2222.

You will have the opportunity to elect to continue medical, dental and vision insurance coverage through COBRA. You will be receiving COBRA information from the company's COBRA administrator (CobraServe) within 15 days.

Additionally, you will have the opportunity to convert your company-provided life insurance coverage, any optional life and/or dependent life insurance coverage. You must contact the Benefit Service Center within 31 days of your separation date to elect this coverage.

Please contact me if you have any questions.

Sincerely,

Katie Lawler

Enclosure
cc: Personnel File



**Exhibit C**



# TRIBUNE COMPANY

## DISABILITY PLANS

### Summary Plan Description

### 1992

## INTRODUCTION TO YOUR DISABILITY BENEFITS

A disability can have a big impact on your life. It affects not only your health, but also your personal finances. While you're off the job, everyday living expenses continue just as before. That's why Tribune Company has a disability program — to provide you with an income while you're unable to work.

The disability program provides you with these coverages:

- Paid Sick Days Program, which pays your regular salary when you're out for a day or two.
- Short-Term Disability Program (STD), which replaces a part of your pay for up to 26 weeks during your disability.
- Long-Term Disability Plan (LTD), which pays benefits if your disability is more serious.

This booklet is a summary of your sick pay and disability benefits for the eligible employees described on page 1. Certain employees covered by collective bargaining agreements may have different benefits described in separate booklets.

The LTD Plan is based on official legal contracts. If there is a disagreement between this booklet and those documents, the legal documents will always govern. In addition, nothing in this booklet says or implies a contract of employment between you and the company. Tribune Company also reserves the right to change, amend, or terminate these plans and contribution rates at any time.

If you have any questions after you've read this booklet, contact your benefits representative.

## TABLE OF CONTENTS

|                                                                    | Page |
|--------------------------------------------------------------------|------|
| Plan Participation and Cost                                        | 1    |
| Plan participation                                                 | 1    |
| Plan cost and funding                                             | 1    |
|                                                                    |      |
| Paid Sick Days Program                                            | 2    |
|                                                                    |      |
| Short-Term Disability Benefits                                    | 3    |
| Filing STD claims                                                 | 3    |
| Important points                                                  | 4    |
| If you have more than one disability                              | 4    |
| When benefits are not paid                                        | 4    |
| If you're disabled while on leave                                 | 5    |
| If you're disabled during vacation                                | 5    |
| Vacations and holidays                                            | 5    |
| Payroll deductions during short-term disability                   | 5    |
|                                                                    |      |
| Long-Term Disability Benefits                                     | 6    |
| When benefits are paid                                            | 6    |
| Total disability                                                  | 6    |
| Sources of LTD benefits                                           | 6    |
| Maximum benefits                                                  | 7    |
| LTD payment examples                                              | 7    |
| A note on social security benefits                                | 7    |
| Adjustment of benefits                                            | 8    |
| If you have a mental or nervous disorder                          | 8    |
| Pregnancy                                                          | 8    |
| Rehabilitation benefits                                           | 8    |
| Death benefits                                                    | 8    |
|                                                                    |      |
| Situations Affecting LTD Benefits                                 | 9    |
| Duration of benefits                                              | 9    |
| If you have more than one disability                              | 9    |
| When benefits are not paid                                        | 10   |
| When you return to work                                           | 10   |
| When you reach retirement                                         | 10   |
| When coverage ends                                                | 10   |
|                                                                    |      |
| How Disability Affects Your Other Benefits                        | 11   |
| While receiving STD benefits                                      | 11   |
| While receiving LTD benefits                                      | 11   |
|                                                                    |      |
| Filing a Claim                                                    | 12   |
| Filing LTD claims                                                 | 12   |
| Paying taxes on your benefits                                     | 12   |
| If an LTD claim is denied                                         | 12   |

Page

Other Situations ..................................................13
    Attachment of benefits...............................13
    If your LTD benefit is overpaid....................13
    If the plans end.........................................13

Administrative Information........................14
    Plan sponsor and administrator ..................14
    Plan type, number, and year .......................14
    Claims processors .....................................14
    Plan trustee..............................................15
    Agent for service of legal process ...............15
    Employee Retirement Income Security Act.....15

Your Rights Under ERISA ........................16

## PLAN PARTICIPATION AND COST

> Once you're eligible, you participate in the plans automatically.

The Tribune employee benefits program provides plans that continue all or part of your pay while you have to be away from work because of a disability. The Paid Sick Days Program and the Short-Term Disability Program are salary continuation company pay policies. The Long-Term Disability Plan is an employee welfare plan under the Employee Retirement Income Security Act (ERISA).

The Short-Term Disability Program is administered by MedEval and is paid through payroll. The Long-Term Disability Plan is administered by CNA Insurance, self-insured by Tribune Company and paid through a tax-qualified trust at Northern Trust.

### Plan participation

Eligible employees are full-time employees, other than those who are covered by collective bargaining agreements under which benefits were bargained in good faith and whose participation in the programs is not required by a collective bargaining agreement. You're a full-time employee if you work the number of hours in the company's normal work week (but not less than 30).

- Your participation in the Paid Sick Days Program begins automatically on the first day you join the company.

- You are eligible for the Short-Term Disability Program (STD benefits) after you complete one year of continuous full-time service.

- You are eligible for the Long-Term Disability Plan (LTD benefits) if you are at least age 18 and have completed one year of continuous full-time service. If you've already completed one year of service by your 18th birthday, you'll automatically be covered by the plan at age 18.

For the purposes of these plans, "continuous service" means one consecutive 52-week period of full-time work.

If you're not at work on the date your coverage is scheduled to start, coverage will begin on the day you return to full-time work.

### Plan cost and funding

Tribune Company pays the full cost of your disability benefits.

Paid sick days and STD benefits are paid through general company assets. LTD benefits are paid from a trust established for this plan. The trust is funded by company contributions, which are actuarially determined. For more information on the trust fund, see the "Administrative Information" section.

1

## PAID SICK DAYS PROGRAM

> The Paid Sick Days Program continues your regular pay for up to five working days.

Colds and flu are facts of life. When personal illness or injury keeps you away from work for a relatively short period of time, your pay continues with the Paid Sick Days Program.

The program continues your regular pay for up to five working days per calendar year. Your benefits begin the first day you're absent.

If you're a new employee, your sick days are prorated during your first calendar year with the company, as follows:

| If you're hired in: | Your prorated days equal: |
|---|---|
| January or February | 5 |
| March or April | 4 |
| May, June, or July | 3 |
| August or September | 2 |
| October or November | 1 |
| December | 0 |

If you're absent from work for any reason, your supervisor should be notified (before the start of your work day) of the reason and how long you expect to be away.

Your sick days can be used if you're away from work to have medical or dental surgery. However, these benefits don't cover time off from work for medical or dental appointments, or to care for any dependents that are ill or injured.

Sick days are granted each year. You cannot carry unused sick days over to the next year.

The company reserves the right to require medical documentation for paid sick days. Absence of requested documentation may result in an unpaid absence.

2

## SHORT-TERM DISABILITY BENEFITS

The STD Program continues a percentage of your pay during a temporary disability.

Short-term disability means absence from work for a medically-certified reason. for example. the flu. a broken leg, or childbirth. The Short-Term Disability Program provides you with income starting on the eighth consecutive day you're temporarily disabled. Disability means the complete inability, due to illness or injury, to perform the duties of your regular occupation. In order to receive short-term disability benefits, you must complete the eligibility requirements described on page 1.

Beginning on the eighth consecutive day of an illness or injury, you'll receive all or a portion of your pay for a certain period of time. This waiting period includes weekends.  For example. if you break an arm on a Saturday, your waiting period would begin on that day — not the following Monday. Your disability will need to be verified by a doctor. Tribune Company reserves the right to request that you be examined by a physician of our choice, at our expense. Failure to cooperate with this request may result in termination of benefit payment. You'll receive pay according to this schedule:

| Your Years of Employment | Weeks at 100% of Pay | Weeks at 60% of Pay | Total Weeks |
|---|---|---|---|
| 1-4 | 6 | 6 | 12 |
| 5-9 | 13 | 13 | 26 |
| 10 or more | 26 | 0 | 26 |

As shown here, once you exhaust the period of full pay (as determined by your years of employment), you'll receive 60% of your pay for a period of time. If your disability continues for 26 consecutive weeks. it's possible that the long-term disability plan will step in, as described on page 6.

For purposes of the STD Program, "pay" includes your base salary and commissions at the time of the disability as well as any amounts you are contributing to company plans on a before-tax basis (such as the SIP, or to the company's health care plans). Commissions are calculated as the average of the 12-month period before your disability started. It does not include bonuses, overtime pay, or special allowances.

### Filing STD claims

To ensure that STD benefits are paid from the eighth consecutive day of your disability, you should contact your benefits representative and request an STD Application form. After you and your doctor complete the form, return it to the benefits representative. The benefits representative will send your claim to MedEval, a third-party claim review company that specializes in objective medical review of STD claims. MedEval will discuss your claim with your doctor's office and make a recommendation to the benefits representative on the length of disability. STD benefits will then be paid to you for the time approved by MedEval.

If it appears your disability will last longer than originally anticipated, you can file an STD Request for Extension form.

3

### Important points

Here are some important points you should keep in mind.

- Sick pay covers the first five consecutive work days and short-term disability begins on the eighth consecutive calendar day.
- If you suffer a disability after you have used all five of your sick days, your STD benefits won't begin until the eighth consecutive calendar day of the disability. You'll receive no pay until that time.
- If you are away from work on STD before you have five years of service, you'll receive benefits for up to 12 weeks. See the chart above. If your disability continues longer than 12 weeks, you will not receive further STD benefits. If you are still disabled after a total of 26 weeks, you may be eligible for long-term disability benefits.
- Some states (such as New York, New Jersey, and California) provide state disability benefits. If you live in one of these states, the STD Program will only pay the difference between your state disability benefits and the above schedule, if our program would pay more.

### If you have more than one disability

If you recover from your illness or injury, return to work, and the same or a related condition occurs within two weeks, it will be considered the same disability. STD benefits will begin again immediately, in the same amount you had previously been receiving.

If you return to work from a short-term disability and subsequently suffer from another disability within a six-month period, you pick up on the benefit schedule remaining from the previous disability. This new period of disability is subject to the waiting period — regardless of the nature of the disability. In other words, you must return to work full time for at least six months before the full benefit period is reinstated.

Pregnancy, including childbirth, abortion, or miscarriage, is considered and treated the same as any other disability.

Benefits aren't payable if your illness or injury is related to another job or covered by workers' compensation laws.

You will be asked to submit medical proof of your disability at least once a month for benefits to continue.

### When benefits are not paid

STD benefits will not be paid for:

- Any absence not medically certified by a company-approved doctor;
- A disability beginning during an unpaid leave of absence;
- A disability beginning during vacation or other paid absence if the disability did not require a doctor's care;
- Routine medical examinations or nondisabling dental care;
- An absence due to misconduct;
- An absence while you are earning wages elsewhere during the hours you were scheduled to work for the company;
- A period of disability continuing beyond the date of your planned termination that has been communicated to the company; or
- A period of disability after your employment has been terminated.

4

Benefits also won't be paid for disabilities resulting from:

- War, whether declared or undeclared, acts of war, or military service (this exclusion does not apply to participants who incur disabilities on account of performing news correspondent duties when assigned to cover war, acts of war, insurrection, rebellion, riot or civil commotion);
- Intentionally self-inflicted injury;
- Committing or trying to commit a crime or engaging in an illegal occupation;
- Participation in an insurrection, rebellion, riot, or civil disturbance;
- A participant's employment with another employer; or
- A disability for which you were not treated by a licensed doctor.

### If you're disabled while on leave

You won't receive short-term disability benefits if you become disabled while on an unpaid leave of absence. If you're still disabled at the end of your leave, benefits will start on the eighth calendar day after your planned return to work.

If you're receiving short-term disability benefits when your leave begins, payments will continue provided you give satisfactory proof of your disability. Payments will continue to be made until the earlier of:

- The date you are allowed to return to work by a company-approved doctor; or
- The date you have received benefits for the maximum amount allowable according to the schedule on page 3.

### If you're disabled during vacation

If you're disabled while on vacation, notify the company. If the disability is medically certified, you'll be taken off vacation and will be eligible for benefits. As with any illness or injury, you will need to provide medical evidence of your disability.

### Vacations and holidays

It is important to note that at year end, STD benefits will be interrupted to allow vacation days to be paid. Thereafter, STD benefits will resume. Your benefits representative and department supervisor are responsible for seeing that vacation is paid before year end.

Holidays are paid as short-term disability days and are not duplicated.

In any event, you can never receive both vacation pay and short-term disability benefits for the same period of time.

### Payroll deductions during short-term disability

Most of your normal payroll deductions will continue while you receive benefits from this plan. This includes taxes, social security, Savings Incentive Plan contributions, and medical, dental, group life, and accident insurance contributions. If you wish to stop any allowable deductions while you are receiving STD benefits, contact your benefits representative.

5

## LONG-TERM DISABILITY BENEFITS

> LTD benefits can start after you've been disabled for 26 consecutive weeks.

If you meet the eligibility requirements described on page 1, long-term disability benefits can begin after you've been totally disabled for 26 consecutive weeks. You'll receive short-term disability benefits during all or part of the waiting period according to your service, as explained on page 3.

If you have a pre-existing condition, benefits may be delayed. Generally, a pre-existing condition is any condition which was diagnosed, or for which you received medical attention, services, or physician-prescribed drugs during the three-month period before you become eligible to participate in the plan.

If your total disability is caused by a pre-existing condition and begins during the first 12 months of coverage, the plan will not pay benefits. If your total disability is caused by a pre-existing condition and occurs after the first 12 months of coverage, the plan will pay a disability benefit subject to any other plan limitations that may apply.

### When benefits are paid

Before LTD payments can start, your total disability will need to be medically certified by a company-approved doctor. It must be considered long-term or permanent and must have existed for 26 consecutive weeks. You must have your doctor complete a certificate — which will be mailed to you — and return it to your benefits representative. To continue receiving benefits, your doctor must complete new certificates semiannually, or more often, if requested. And, you may be required to be examined by a designated company-approved physician. Any such examination is at the company's expense. Failure to cooperate with this request may result in termination of benefit payments.

### Total disability

For a disability to be considered a "total disability," it must be due solely to an injury or disease and require a doctor's regular care and:

- During the first two consecutive years, the disability must make you unable to perform the duties of your job with the company.
- After that, the disability must make you unable to perform any job for which you are or may become reasonably qualified by education, training, or experience.

### Sources of LTD benefits

Tribune Company's plan works with other sources to replace up to 60% of the pay you were earning before becoming disabled.

For purposes of the plan, "pay" means your base salary and commissions as of the date your total disability begins (including any before-tax contributions you are making to any company-sponsored plans). Commissions are calculated as the average of the 12-month period before your disability started. Pay does not include bonuses, overtime pay, deferred compensation, stock options, severance pay, or special allowances.

You may be eligible for disability benefits from several sources. Since the company pays part or all of the cost for other benefits you might receive if you're disabled, the amount of those benefits will be included when figuring your LTD plan benefit. Sources of other benefit payments are:

- Workers' compensation, occupational disease laws, or other disability legislation;
- Social security disability or retirement benefits received by you and your dependents;
- Government or other group insurance plans;
- The Tribune Company pension plan; and
- Income from any employer, or from any job for pay or profit.

The company makes up the difference between the amounts you receive from these other sources and 60% of your base pay. If you are eligible for family social security benefits, the total from all sources can equal only up to 75% of your base pay.

### Maximum benefits

The maximum monthly LTD benefit is $10,000.

### LTD payment examples

Here are several examples of how you could receive LTD benefits depending on the amount of disability income you receive from other sources. (You apply to the other sources, and they'll determine benefits first.) In all the examples, suppose your pay is $2,000 a month; the differences occur when the social security amounts vary. Differences can also occur when there are other sources of income as listed above.

|  | Example 1 | Example 2 | Example 3 | Example 4 |
|---|---|---|---|---|
| Pay per month | $2,000 | $2,000 | $2,000 | $2,000 |
| Income you're eligible to receive from social security |  |  |  |  |
| — Primary | 300 | 0 | 300 | 500 |
| — Family | 0 | 0 | 150 | 350 |
| Tribune Company benefits | 900 | 1,200 | 900 | 650 |
| Total disability income | $1,200 | $1,200 | $1,350 | $1,500 |
|  | (60% of pay) | (60% of pay) | (67.5% of pay) | (75% of pay) |

The plan benefit is 60% of pay, minus your primary social security benefit and other sources of income listed above. If you are eligible for family social security, the maximum amount the plan will pay including all sources of income is 75% of pay.

### A note on social security benefits

Your eligibility for social security disability benefits depends on your illness or injury. In general, these benefits start after you have been totally disabled for five consecutive calendar months.

It's important that you apply for social security benefits. CNA Insurance will assist you in doing so. When calculating your LTD benefit, the company assumes you are eligible for these benefits and deducts an estimated social security benefit amount from your plan benefit. This could have a big impact on the amount of your plan benefit. You'll need to give the company proof if you're not eligible for these benefits.

7

If you apply for social security benefits and your claim is denied, you should send the notice of the denial to CNA Insurance. You will be asked to submit requests for review of the denied claim. CNA Insurance will assist you in filing your request.

Once your social security benefit is determined, it remains the same for purposes of calculating your LTD plan benefit. If your social security payments increase after LTD plan benefits begin, you will receive this increase in full.

### Adjustment of benefits

It's your responsibility to let your benefits representative know if there is any change in your disability income from other sources, such as those listed under "Sources of LTD benefits" on page 6.

### If you have a mental or nervous disorder

If you are totally disabled due to a mental or nervous disorder, benefits are considered as for any other disability, however, you must be hospital-confined in order to continue to receive benefit payment beyond 24 months.

If your disability is caused by alcoholism or drug abuse, benefits will only be paid if you participate in an approved substance abuse rehabilitation program.

### Pregnancy

Pregnancy and childbirth are considered to be disabilities under the plan and are treated in the same way as any other illness or injury.

### Rehabilitation benefits

In some situations, plan benefits will continue while you are receiving pay for work in a rehabilitation program. In order to be eligible for plan benefits, the rehabilitation program must be administered by CNA Insurance. The maximum duration of this program is 24 months.

Once you have returned to work in a rehabilitative employment position, the company will reduce your long-term disability benefit by 50% of the earnings that you receive as a result of such employment.

### Death benefits

If you die while you are totally disabled and have been receiving long-term disability benefits for at least six months, your spouse or dependent children will continue to receive monthly LTD benefits for three months, or until your LTD benefits would have ended — whichever is earlier.

## SITUATIONS AFFECTING LTD BENEFITS

These situations could affect your LTD benefits.

### Duration of benefits

Several situations could cause your benefits to be delayed or stopped. They're described here.

Benefits will automatically stop if:

- You don't provide satisfactory medical evidence of your disability or refuse a medical examination as required by a company-approved doctor;
- You are no longer totally disabled as determined by a company-approved doctor;
- You die; or
- You reach the maximum period for benefits to be paid.

If you become disabled before your 62nd birthday, benefits from the plan will continue up to age 65 or until you are no longer disabled. If you become disabled after your 62nd birthday, benefits will continue under the following schedule or until you begin receiving pension benefits:

| Age at Disability | Benefits Are Paid for |
|---|---|
| 62 | 3-1/2 years |
| 63 | 3 years |
| 64 | 2-1/2 years |
| 65 | 2 years |
| 66 | 1-3/4 years |
| 67 | 1-1/2 years |
| 68 | 1-1/4 years |
| 69 and after | 1 year |

### If you have more than one disability

If you recover from your long-term disability, return to full-time work, and another disability occurs, the date benefits begin depends on when you returned to work. If the second disability occurs:

- Within six months of your return to work, benefits begin immediately; and if you're 62 or older, they last for the amount of disability time you have left from the last disability; or
- After six months of your return to work, benefits begin after another six-month waiting period and continue as if this were your first disability.

9

### When benefits are not paid

Although the plan pays benefits for most disabilities, benefits won't be paid for disabilities resulting from:

- War, whether declared or undeclared, acts of war, or military service (this exclusion does not apply to participants who incur disabilities on account of performing news correspondent duties when assigned to cover war, acts of war, insurrection, rebellion, riot or civil commotion);
- Intentionally self-inflicted injury;
- Committing or trying to commit a crime or engaging in an illegal occupation;
- Participation in an insurrection, rebellion, riot or civil disturbance;
- A disability for which you were not treated by a licensed doctor;
- An illness or injury that happened while you were working for someone other than the company; or
- An illness or injury that is caused by a pre-existing condition and begins during the first 12 months of coverage.

### When you return to work

In general, you must return to work within three days of when a company-approved doctor releases you to return to active service.

If your disability is longer than six months and you become eligible for benefits under the company's long-term disability plan, you'll be paid for your earned, unused vacation while you were on short-term disability once your LTD benefits start.

### When you reach retirement

If you are eligible for pension benefits when you become disabled, you may want to delay applying for your pension benefit until you are no longer eligible to receive LTD benefits. If you apply for pension before the end of your LTD benefits, pension benefits will be considered another income source and will reduce your LTD benefits.

Otherwise, your disability benefits continue up to the maximums allowed for each plan.

If you are over age 62, LTD will continue for the maximum allowed by the plan.

### When coverage ends

You will no longer be covered by the long-term disability plan if:

- You leave the company;
- You are no longer eligible;
- You enter the armed forces of any country on a full-time basis; or
- The plan ends.

Unlike some of your other benefits, disability can't be converted to an individual policy when your coverage ends.

10

## HOW DISABILITY AFFECTS YOUR OTHER BENEFITS

> In some cases, you continue to be eligible for other benefits during a disability.

When you're away from work because of a disability, here's what happens to your other benefits.

### While receiving STD benefits

While you're receiving STD benefits, a number of benefits — Reimbursement Accounts, medical and dental coverage for you and your eligible dependents and life and accident coverage — continue just as though you were at work. Your coverage under the pension plan continues as though you were at work. If you have a SIP account, it may continue to be invested, and contributions will be accepted.

### While receiving LTD benefits

If you become totally disabled and begin to receive LTD plan benefits, your medical, dental, life and accident insurance coverages continue. Your share of the premiums are deducted from your LTD check.

Under the terms of the pension plan, you will continue to earn benefit service as long as you are on long-term disability. However, without any earnings from payroll, you will not be able to contribute to SIP or the Reimbursement Accounts. Your SIP account will continue to be invested and share in the investment results of the plan. Reimbursements from the Health Care Reimbursement Account will be made for those expenses incurred before your LTD start date. Reimbursements from the Dependent Care Reimbursement Account can be made for expenses incurred before and after the LTD start date.

11

## FILING A CLAIM

> Disability benefits are payable after you submit a claim.

You receive sick pay and short-term disability benefits through the regular payroll system, as long as your illness or injury is reviewed by MedEval and approved by your department.

If you believe your injury or illness will continue for more than five consecutive working days, you should notify your benefits representative. He or she will give you an STD Application form to be completed by you and your doctor.

### Filing LTD claims

In order to ensure that LTD benefits begin after 26 weeks of disability, after you've been away from work because of a disability for 16 weeks, your benefits representative will contact you about filing a claim for LTD benefits and applying for social security disability benefits. CNA Insurance will assist you in this process. You will be asked to fill out another claim form and attach medical evidence of your disability. The company may ask you to submit to a medical examination before benefits are paid and from time to time while you're receiving benefits as proof of your continuing disability. You must let CNA Insurance know whether or not you have been approved for social security disability benefits by providing a copy of the letter you receive from social security.

Remember, the company will estimate any benefits you may be eligible to receive from other sources when calculating your LTD benefit. Once you provide proof of your claim or final claim denial, an adjustment will be made retroactively to your first day of long-term disability. If you file late, or if the determination takes longer than 120 days, the adjustment will be retroactive to the beginning of the social security disability award effective date.

### Paying taxes on your benefits

Taxes will be withheld according to the applicable laws governing disability pay. See your tax advisor for any questions or clarifications you require.

### If an LTD claim is denied

If you file a claim for benefits and your claim is denied, you will be notified within 90 days. If additional time is needed to make a decision, you will be notified of this fact within the 90 days and then notified of the decision within 180 days after you filed your claim. You will have 60 days after you receive notice of a denied claim to request in writing that the plan administrator review the decision denying the claim. The plan administrator will, if requested, permit you to examine any documents relevant to your claim, and permit you to submit additional comments in writing if you should wish to do so. The plan administrator will then notify you of its decision within 60 days after it received your request for review. If additional time is needed to make a decision, you will be notified of this fact within 60 days. and you will then be notified of the plan administrator's decision within 120 days after it receives your request for review.

## OTHER SITUATIONS

These are some situations that could affect all of your disability benefits.

The company's disability plans are designed to provide you with income protection you can rely on. But some situations could affect plan benefits.

- If you don't provide the necessary information on application forms, benefits will be delayed until you do.
- If your address changes while you're receiving benefits and you don't notify the company, benefits may be delayed.
- If you do not have a medical examination required by the plan, benefits could stop.
- If your disability stops, payments stop.

In any event, you should remember that the plan administrator and claims administrator have discretionary authority both to determine eligibility and to make decisions regarding claims under the terms of the plan. If a claim is denied, you have the right to a review, as explained on page 12.

### Attachment of benefits

To the extent permitted by law, all rights and benefits under this plan are exempt from execution, attachment, garnishment, or other legal process for your debts or liabilities.

### If your LTD benefit is overpaid

If your LTD benefit is overpaid any month for any reason, the company has the right to request and receive a lump-sum repayment. The company may, at its option, deduct the amount of excess payments from subsequent monthly benefits payable to or for your benefit.

### If the plans end

The company reserves the right to change, amend, or terminate these plans from time to time, in whole or in part. Should the plans ever be terminated, suspended, or modified, benefits with respect to claims incurred before the plan's termination or modification will be paid under the terms prior to termination or modification.

13

## ADMINISTRATIVE INFORMATION

> General administrative information for the company's disability program can be found here.

### Plan sponsor and administrator

The salary continuation and disability plans described in this booklet are sponsored by:

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
(312) 222-3232

Tribune Company is also the plan administrator. In most cases, the responsibility to administer and interpret the plans and make the final decisions on such issues as eligibility and payment of benefits has been delegated to the Tribune Company Employee Benefits Administrative Committee. Generally, this committee has the responsibility to interpret and enforce plan provisions, determine all questions arising under the plan, and adopt such procedural and other rules as in its opinion may be necessary for the proper and efficient administration of the plan and are consistent with the plan documents. However, most of your day-to-day questions will be answered by your benefits representative.

A number of other employers also participate in the plans. You can get a complete list by writing to the plan administrator. You can also examine the list during normal business hours at the plan administrator's office.

### Plan type, number, and year

Documents and reports for some plans are filed with the United States Department of Labor under two numbers: the company's Employer Identification Number (EIN) and the Plan Number (PN). The EIN for Tribune Company is 36-1880355. The Plan Number is 503. The official plan name is the Tribune Company Group Long-Term Disability Plan.

The Long-Term Disability Plan is considered to be a welfare plan for government purposes. Records are kept on a plan-year basis, which is the same as the calendar year (January 1-December 31).

### Claims processors

Claims are processed through, and initial determination and certain interpretations are made by:

Short-Term Disability
MedEval
1920 Highland Avenue
Lombard, Illinois 60148

Long-Term Disability
CNA Insurance
1707 Orlando Central Parkway
Orlando, Florida 32809

14

### Plan trustee

The Long-Term Disability Plan is funded through the Trust for Employee Welfare Benefit Plans of Tribune Company and its Subsidiaries. The trustee is:

The Northern Trust Co.
50 South LaSalle Street.
Chicago, Illinois 60690

### Agent for service of legal process

The agent for service of legal process is Stanley J. Gradowski, Secretary, who may be contacted at the company's main address. Process may also be served on the plan administrator.

### Employee Retirement Income Security Act

Tribune Company's benefit plans are designed to meet the requirements established by the Employee Retirement Income Security Act of 1974 (ERISA) if they are subject to that Act.

The plans will be amended to conform with any changes in the law or government regulations.

15

## YOUR RIGHTS UNDER ERISA

By law, you have certain rights under the long-term disability plan.

As a participant in the long-term disability plan sponsored by Tribune Company. you're entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). Your rights under ERISA include the following:

- You may visit your benefits representative and examine all plan documents without charge. These may include the annual financial reports, the plan descriptions, and all other official plan documents filed with the United States Department of Labor.
- You may obtain copies of plan documents and other information by writing to the plan administrator. You may be charged a reasonable amount for these copies.
- You automatically receive a written summary of the plan's annual financial reports.
- You may not be discharged or discriminated against to prevent you from obtaining a benefit or exercising your ERISA rights.
- If your claim for a benefit is denied in whole or in part, you'll receive a written explanation from the plan administrator. You have the right to have the plan administrator review and reconsider your claim.

In addition to creating rights for plan participants, ERISA imposes certain duties on the people responsible for the operation of the plan. The people who operate the plan, called "fiduciaries," have a duty to do so prudently and in the best interest of you and other plan participants and beneficiaries.

Under certain circumstances, outside assistance may be necessary to resolve disputes between you and plan officials. For example:

- If you request materials from the company's plan and don't receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $100 a day until you receive the materials — unless the materials were not sent because of reasons beyond the control of the plan administrator.
- If your claim for benefits is denied or ignored, in whole or in part, after a final review, you may file suit in a state or federal court.
- If the fiduciaries misuse the plan's money, or if you're discriminated against for pursuing a benefit or exercising your ERISA rights, you may seek help from the United States Department of Labor or file suit in federal court.

If you file a suit against the plan, the court will decide who should pay costs and legal fees. If you win your suit, the court may order the person you've sued to pay the court costs and legal fees. If you lose your suit, the court may order you to pay the costs and fees if, for example, the court decides your suit was frivolous.

If you have any questions about this statement or about your ERISA rights, you should contact your benefits representative. If you wish, you may contact the nearest area office of the Pension and Welfare Benefit Administration, United States Department of Labor.

16

# TRIBUNE

## SHORT-TERM DISABILITY POLICY

Revised January 1, 2002

P 00048

## 1. In General[1]

Tribune Company's Short-Term Disability (STD) Policy is designed to continue a percentage of your pay during a qualifying temporary disability. The STD policy provides you with pay continuation for up to 26 weeks starting on the eighth consecutive day after you are temporarily disabled. For purposes of this policy, disability means the complete inability to perform the duties of your regular position, due to an illness or injury. In order to be approved for STD benefits, you must meet the eligibility requirements described below, satisfactorily complete the necessary forms, and have your disability verified by an approved medical doctor.

If you are still disabled after 27 weeks, you may be eligible for Long-Term Disability (LTD) benefits. For information on LTD, consult the Benefits Service Center at 1 (800) 872-2222.

If your injury or illness occurs **while working**, you need to inform your supervisor and the health unit of the circumstances surrounding your injury or illness, as you may be eligible for workers' compensation.

**The following is a summary of the major provisions of the Tribune STD policy. This summary applies to eligible full-time employees of Tribune Company and its business units. Please note that there may be some provisions of this policy that do not apply to union-represented employees. If you have any questions about this policy, please contact Human Resources.**

## 2. Eligibility

Effective January 1, 2002, employees eligible for STD benefits are those with at least six months (26 weeks) of continuous full-time service with the Company. For the purpose of this policy, "continuous full-time service" means one consecutive 26-week period of full-time work. This service requirement is waived for any active full-time employees continuously employed full-time since December 31, 2001. For purposes of the policy, you will be considered a full-time employee only if you are classified as a full-time employee on the payroll records of the Company, notwithstanding any subsequent determination by a court of law or governmental agency.

If you suffer an injury or illness prior to being eligible for STD and go on leave, you will not be eligible for an STD benefit for that injury or illness until you have returned to work and met the above eligibility requirement.

## 3. Filing an STD Claim

In order to file an STD claim, you must first notify your department payroll administrator. Once the payroll administrator is notified of your illness or injury, you will be sent an STD packet. Included in the packet is the STD Initial Application form. Both you and your doctor must complete the form. If you do not sign the form, it cannot be processed. **You must generally return the form to Human Resources within 30 days or your benefits may be denied.**

Keep in mind that an approved medical doctor must be actively treating you in order for you to be eligible for STD. For purposes of this policy, an approved medical doctor is defined as a medical doctor, osteopathic physician, podiatrist or dentist. Employees may be treated by other health care professionals, but the Company will not recognize an STD form completed solely by a non-approved

---

[1] **POLICY CHANGE DISCLAIMER:** Tribune and its affiliates reserve the right to change, amend or terminate the STD policy from time to time, in whole or in part. Should the STD policy ever be terminated, suspended or modified, benefits with respect to claims incurred before the policy's termination, suspension, or modification will generally be paid under its terms in effect prior to termination, suspension or modification.

Tribune has the power to construe and interpret the policy and to determine all questions arising with respect to its administration at its complete discretion, including the power to determine the rights and eligibility of employees, participants and their beneficiaries, and the amount, manner and time of payment of any benefits hereunder, and to remedy ambiguities, inconsistencies, and omissions.

P 00049

medical doctor, including a psychologist, chiropractor, nurse practitioner, social worker or midwife, unless otherwise mandated by law. If you are not under the direct and continuous care of an approved medical doctor or if you are not following a course of treatment prescribed by your healthcare provider, your STD benefit may be denied and/or stopped.

When your primary disabling diagnosis is a psychiatric one (for example, anxiety, major depression, bipolar disorder), a psychiatrist must complete the STD paperwork in order to receive STD benefits for any STD leave that exceeds 2 weeks. Thus, if your primary care physician completes your initial STD paperwork for a psychiatric illness and it is deemed likely that your disability will exceed 2 weeks, you must obtain referral/consultation and/or follow-up evaluations from a psychiatrist for ongoing disability determinations. Your treating psychiatrist would then be responsible for completing all subsequent STD extension forms. Failure to do so can lead to a denial or disruption in your disability payments.

The primary disabling diagnosis is defined as that diagnosis which is the major diagnosis that prevents you from working. A psychiatrist is a medical doctor (M.D. or D.O.) and therefore can provide psychotherapy and/or prescribe medication, whereas a psychologist is a PhD and can provide psychotherapy, but, in most states, cannot prescribe medication.

Once Human Resources receives the completed application, the Company will then forward your claim to Prudential, the STD carrier. Prudential will review your claim and contact your doctor to verify the information, request medical records, and/or ask any questions necessary to certify that you are disabled. Human Resources and/or Prudential will notify you of the status of your application for STD benefits and request any additional information needed.

If it appears that your disability will last longer than originally anticipated, Prudential will request additional medical information from your treating physician(s). Prudential will review your claim based on the updated information provided by your doctors. Your STD benefit will be suspended until your STD extension period is approved. Each time your STD is extended, Prudential will notify you of the additional approval period. If your request for an extension of STD benefits is not approved, you will be notified and may be expected to return to work.

Pregnancy, including childbirth, abortion or miscarriage, is considered and treated the same as any other disability under this policy. Typically, you receive STD benefits for six weeks after the date of birth of a child, regardless of how you deliver the baby, and after these six weeks, assuming you have no other qualifying disability, you are no longer considered disabled for purposes of this policy and your STD benefit will stop. You may, however, still be eligible for additional unpaid leave under the Family and Medical Leave Act or similar state laws.

If your doctor charges a fee for completing the STD form or sending any necessary medical records to the Company, it is your responsibility to pay the fee. If you do not pay the fee, the processing of your STD claim may be delayed and/or your STD benefits may be denied.

Tribune reserves the right to request that a doctor of its choice examine you at its expense. This is known as an Independent Medical Examination (IME). Failure to submit to an IME will result in the termination of your STD benefits.

If you become disabled while on vacation, you will be taken off vacation and become eligible for STD benefits, assuming you are otherwise qualified for benefits under this policy.

## 4. Waiting Period

The STD policy provides you with benefits starting on the eighth consecutive calendar day you are disabled and absent from work. During the first seven calendar days of approved STD, known as the "waiting period," in order to receive pay, you must use your sick, personal and vacation days, if available. If you have no remaining sick, personal or vacation days, you will not be paid during the waiting period. In most situations, you are required to exhaust your sick days during the waiting period.

2

P 00050

## 5. STD Benefit

*No STD benefits* will be paid until an approved medical doctor completes the STD certification form and the Prudential approves you for benefits. The amount of the STD benefit for which you are eligible is based on your eligible compensation and the schedule attached to this policy. For purposes of this policy, "eligible compensation" means your base salary, plus, if applicable, commissions. Commissions are calculated as the average commissions earned during the 12-month period before your disability started. If you had not yet earned commissions for 12 months, commissions will be calculated based on the average commissions earned during all of the months you worked for the Company prior to your disability occurring. Eligible compensation excludes bonuses, stock options, overtime pay, special allowances, etc.

Unless otherwise required by law, any change in the amount of your base salary while you are on STD will not affect your eligible compensation and will not be considered to take effect until you have returned to work.

If your STD benefit is overpaid for any reason, you will be required to repay the excess benefit within 30 days of the Company's notification to you of the overpayment. If permitted by law, the Company may, at its option, deduct the amount of any excess payments from your paychecks.

While you are on STD, you will not be paid for any Company holidays or personal days. If you are still certified as disabled but are no longer eligible for STD pay, you will be required to use your remaining sick and personal days, if any.

Some states (for example, New York, New Jersey and California) provide state disability benefits. If you are eligible for a state disability benefit or NYS no fault benefits you **must** inform Human Resources of the benefits you receive. You will only be eligible for an STD benefit so that the **total** benefits you receive from the Company, the state, and no fault auto are equal to the STD benefit you would otherwise receive under the attached Schedule. In other words, the total pay that you receive from state disability benefits and this policy, if any, cannot exceed the benefits set forth in the Schedule. Alternatively, if you receive an STD benefit and then subsequently become eligible for state disability benefits or no fault, you will be required to remit the excess benefit back to the Company.

## 6. Returning To Work

When your doctor releases you to return to work, you must have your doctor complete the Return to Work Release form. You must bring the form with you on your first day back to work, give it to you're the health unit. If you return to work without a fully completed release form, you may not be permitted to return to work, and your absences may be considered to be unexcused.

If you are not yet well enough to return to work at full duty but your doctor has allowed you to return to work with restrictions, contact the Health Unit. If the Company is able to accommodate the restrictions, a return to work date would be determined and the Company would expect you to return to work. Unless otherwise required by law, these restrictions must be temporary and your return to full duty must be anticipated in the near future. Once you return to work, whether with or without restrictions, full-time or part-time, your STD benefits will stop. You must generally follow up with your doctor until you are released to full duty.

If your department is not able to accommodate the restrictions, you would continue on STD for as long as possible under this policy or until you are fully released to return to work. The Company may also work with you to find another position that fits within your restrictions. You would continue to provide STD extension forms from all treating doctors to verify your disability. You will be required to submit the STD forms until the earlier of the time that you are able to return to work or are eligible for long-term disability.

3

P 00051

This policy is only meant to provide for pay during an otherwise approved leave. Qualifying for benefits under this policy in no way constitutes a guarantee that you will be eligible for leave or that your position will be held open during your leave.

## 7. Multiple Disability Leaves

If you have been disabled for 27 weeks and during that time you exhaust your benefits under this policy, you will not be eligible for an additional full STD benefit until you have returned to work for six consecutive months.

If following a leave where you collected STD benefits you return to work and you become disabled again within two weeks of returning to work, STD benefits will begin again immediately, picking up where you left off on the benefit schedule remaining. You will not be subject to the waiting period. If following a leave where you collected STD benefits you return to work, and you become disabled again after 2 weeks but within 6 months of returning to work, STD benefits will begin again after another waiting period, picking up where you left off on the benefit schedule remaining.

Disability benefits paid out under a Company business unit policy will be treated as benefits paid out under this policy. For example, if you collected salary continuation from November 1 through December 31, 2001 under a business unit disability pay policy, and then effective January 1, 2002 became eligible for STD benefits under this policy, the weeks of salary continuation you received during 2001 would count toward the STD benefits you may be eligible to receive under this policy.

## 8. When Benefits Are Not Paid

The following are some additional situations where employees will not be eligible to collect STD benefits:

- if the Company determines that you have recovered from your disability;
- if you have exhausted the maximum number of weeks that you are eligible for STD benefits;
- if you have returned to work, including if you are on restricted duty;
- if your injury is covered by workers' compensation;
- if your disability is not serious enough to require a doctor's care, including if you require only routine medical care or non-disabling dental care;
- if you apply for STD during an absence due to misconduct or while you are on disciplinary suspension;
- if you become disabled while you are working for another company during the hours you were scheduled to work for the Company;
- after death;
- during an absence for cosmetic surgery not for reconstructive purposes;
- after you no longer work for the Company;
- if you became disabled while engaging in an illegal activity; or
- if you become disabled while participating in an insurrection, rebellion, riot or civil disturbance, or
- if you become disabled during any period of military activation (this exclusion does not apply to participants who incur disabilities on account of performing news correspondent duties when assigned to cover acts of war or civil commotion).

Your business unit may also apply certain other eligibility exceptions. See attached Schedule.

## 9. Payroll Deductions During STD

Since the STD policy is a salary continuation policy, your normal payroll deductions will continue while you receive an STD benefit. This includes, for example, taxes, social security, insurance, United Way,

4

reimbursement accounts, group legal, retirement savings plan, and Employee Stock Purchase Plan (ESPP). If you are out on STD but have stopped receiving or exhausted the STD benefit, Human Resources will contact you to let you know whether you will be billed for benefit deductions or have them taken out of your paychecks if they resume in the future.

## 10. Family and Medical Leave Act (FMLA)

While you are out on STD, you may be eligible for leave under the Family and Medical Leave Act (FMLA) and applicable state leave laws. FMLA leave, if any, runs concurrently with STD. If you have any questions about FMLA, please see Human Resources.

5

## STD SCHEDULE OF BENEFITS

### STD SCHEDULE*

| Years of Employment | Weeks at 100% of Pay | Weeks at 75% of Pay |
|---|---|---|
| 6 mos or more | Weeks 1 through 6 | Weeks 7 through 26 |

* The schedule begins after the waiting period.

### VACATION

You cannot receive vacation benefits if you are already receiving STD benefits. You may, however, use vacation, sick and personal days if you are out on STD but are not eligible for STD benefits. At the end of a calendar year while you are out on STD, accrued unused vacation is forfeited and cannot be carried over from one year to the next. Moreover, if you have accrued unused vacation when you become eligible for LTD, you will forfeit that vacation unless you return to work in that same calendar year.

In no event can unused sick days, personal days, or holidays be carried over from one year to the next.

### WORKERS' COMPENSATION

If you are injured at work and are eligible for workers' compensation benefits, you will not be eligible for any STD benefits. If you receive any STD benefits and then subsequently become eligible for workers' compensation, you will be required to remit the STD benefits back to the Company.

6

P 00054

**Exhibit D**

# GLYNN AND MERCEP LLP

## LAWYERS

NORTH COUNTRY ROAD, P.O. BOX 712
STONY BROOK, L.I., NEW YORK 11790-0712
631-751-5757
www.glymerlaw.com

ANTHONY W. MERCEP*
TIMOTHY B. GLYNN
LAWRENCE E. KELLY

*N.Y. AND MASS. BARS

BRADLEY C. ABBOTT
MARTIN F. SIMON

OF COUNSEL
BRIAN P. KEIFER*

*N.Y. AND CA. BARS

October 5, 2004

Katie Lawler, Vice President
Human Resources and Labor Relations
Newsday
235 Pinelawn Road
Melville, NY 11747

Re:   Gerard Schultz

Dear Ms. Lawler:

We are attorneys for Gerard Schultz who was purportedly terminated effective September 2, 2004, as expressed in your letter dated September 3, 2004. At the time of his termination Mr. Schultz was out on medical disability leave. We request clarification of the company's position.

It appears to us, after review of your Summary Plan Description that Mr. Schultz was eligible for Short Term Disability benefits and should have been receiving full salary under the terms of your plan as of the 8th day of his Disability and would have continued, in Mr. Schultz' case for the maximum of 26 weeks if he were unable to return to work. The seven day waiting period should have been covered by Mr. Schultz sick days. It also appears to us that, having been out on disability at the time of his termination, that his Short Term Disability benefits should continue notwithstanding his termination for as long as he is disabled or until the 26 weeks were used up, the expiration of the Short Term Disability Period.

We note that Mr. Schultz' short term disability has been approved through September 23, 2004. We hereby request that that period be extended. We enclose Mr. Schultz last office visit notes with Dr. Thomas J. Dowling, M.D., F.A.C.S. showing that Mr. Schultz is still totally disabled and requires further surgery. Kindly provide us with any additional requirements you may have to establish his continued disability.

Katie Lawler. Vice President                                    October 5, 2004
Page 2

It further appears to us that his right to receive Long Term Disability payments is unaffected by his termination if his disability period extends into the time such benefits would be applicable.

Kindly confirm our understanding or provide clarification if your understanding is different.

Very truly yours,

GLYNN and MERCEP, LLP



Timothy B. Glynn

TBG/lls
Encl.
cc:   Mr. Gerard Schultz
_Via Facsimile 631-843-5218 and Regular Mail_

D 0261

**Exhibit E**

James P. Osick
Director/Senior Counsel
Labor and Employee Relations
312/222-5933

# TRIBUNE

435 North Michigan Avenue
Chicago, Illinois 60611-4001
fax: 312/222-3860
e-mail: josick@tribune.com

October 26, 2004

Timothy B. Glynn
Glynn & Mercep LLP
North County Road
P.O. Box 712
Stony Brook, New York 11790-0712

**Re: Gerald Schultz**

Dear Mr. Glynn:

Your letter to Katie Lawler at Newsday regarding Gerald Schultz has been forwarded to me for response.

Newsday terminated Mr. Schultz's employment on September 2, 2004. Under the Company's disability policies, once an individual's employment is terminated, they are no longer eligible for either short term or long term disability benefits. Thus, Mr. Schultz's entitlement to disability benefits ended on September 2, 2004.

Very truly yours,

James P. Osick



RECEIVED

NOV 1 2

HUMAN RESOURCES

VERIFICATION

STATE OF NEW YORK )
                  )ss.:
COUNTY OF QUEENS  )

I, JADE L. FULLER, an attorney admitted to practice before
all of the Courts of the State of New York, state that I am a
member of the firm, Giaimo Associates, LLP, the attorneys of
record for the plaintiffs in the within action; I have read the
plaintiff's Verified Complaint and the contents thereof, and the
same is true to my own knowledge, except those matters therein
which are stated to be alleged upon information and belief, and
as to those matters believe them to be true. The source of my
information and the grounds for my belief as to matters not
therein stated upon my knowledge are papers and communications
contained in the file and conversation with the plaintiffs.

The reason I make this verification instead of plaintiff is
that plaintiff resides in a County other than the one in which
deponent's law firm maintains its office.

I affirm that the foregoing statements are true under
penalties of perjury.

Dated: Queens, New York
       April 6, 2010

                                    Jade L. Fuller

Index No.                     Year

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

GERARD SCHULTZ,
                    Plaintiff,
                         -against-

NEWSDAY, INC.,
                    Defendant.

SUMMONS AND VERIFIED COMPLAINT

### GIAIMO ASSOCIATES, LLP
ATTORNEYS AT LAW
*Attorneys for* Plaintiff
*Office and Post Office Address, Telephone*
80-02 Kew Gardens Road
Kew Gardens, New York 11415
(718) 261-6200

To                                          Signature (Rule 130-1.1-a)


Attorney(s) for

Service of a copy of the with                     is hereby admitted.

Dated

                                        Attorney(s) for

Please take notice
☐ NOTICE OF ENTRY
that the within is a certified) true copy of a
duly entered in the office of the clerk of the within named court on
☐ NOTICE OF SETTLEMENT
that an order                                    of which the within is a true copy will be presented for
settlement to the HON.                                                    one of the judges of
the within named court, at          on          at          M

Dated,


                                                      Yours, etc.
To                                          **GIAIMO ASSOCIATES, LLP**
                                                   ATTORNEYS AT LAW
                                             *Attorneys for* Plaintiff
Attorney(s) for                              *Office and Post Office Address, Telephone*
                                              80-02 Kew Gardens Road
                                             Kew Gardens, New York 11415
                                                   (718) 261-6200

Exhibit 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
----------------------------------------X
GERARD SCHULTZ,

                Plaintiff,

    -against-

NEWSDAY, INC.,

                Defendant.
----------------------------------------X

Index No.: 13469/10

AMENDED VERIFIED
COMPLAINT

Plaintiff, GERARD SCHULTZ, by his attorneys Giaimo Associates, LLP, as and for his Amended Verified Complaint herein alleges, upon information and belief, as follows:

1.    At all times hereinafter mentioned, plaintiff Gerard Schultz is and was a resident of the County of Suffolk, State of New York.

2.    At all times hereinafter mentioned, defendant Newsday, Inc. ("Newsday") is and was a corporation duly organized and existing under and by virtue of the laws of the State of New York with a principal office in the County of Suffolk, State of New York and a publisher and distributor and/or co-publisher and co-distributor of "Newsday" newspaper.

3.    At all times hereinafter mentioned, Tribune Company, Inc. is not a defendant herein and is and was a corporation duly organized and existing under and by virtue of the laws of the State of Illinois, and duly authorized to conduct business within the State of New York and formerly the owner of Newsday,

and is presently in bankruptcy pursuant to Chapter 11 of the
Federal Bankruptcy laws. Newsday and Tribune are hereinafter
collectively referred to as "Newsday".

4. At all times hereinafter mentioned, Newsday was an
employer who employed plaintiff within the meaning of New York
State Executive Law §292 ("Human Rights Law").

5. At all times hereinafter mentioned, plaintiff was
employed by Newsday from in or about 1980 until his termination
therefrom as hereinafter described.

6. In or about July 1980 plaintiff was hired by Newsday
as a truck helper and during his employment was promoted to
various positions within Newsday, such as road foreman and
assistant foreman of night operations. In or about 1996
plaintiff was promoted to Sales Manager of Long Island Single
Copy Sales.

7. On or about January 19, 2001, plaintiff suffered
severe injury to his back resulting, amongst other things,
specifically in spondylolysis and anterolisthesis with arthritic
degeneration as a result of an automobile accident ("accident')
unrelated to his employment.

8. Thereafter, on or about January 26, 2001, plaintiff
returned to his employment at Newsday and resuming his normal
employment activities, notwithstanding his serious injuries
resulting from the accident.

2

9. As a result of the accident, on or about May 29, 2002, plaintiff was required to undergo spinal surgery to correct his injuries and was unable to return to his employment at Newsday following such surgery until on or about November 1, 2002, when he resumed his normal employment duties and activities notwithstanding the continual pain resulting from his back injury.

10. Notwithstanding the injuries from the accident, at no time during the course of plaintiff's employment from 1980 up until the time of his termination by Newsday as hereinafter described, was plaintiff accused of, admonished for or notified by Newsday that he was not satisfactorily performing his job related duties.

11. On or about August 9, 2004, plaintiff was required to undergo a second corrective spinal surgical procedure for the injuries he suffered in his accident; as a result, he was required to take medical leave from his employment at Newsday from August 9, 2004 to February 24, 2005("short term medical leave") and if he was permanently disabled after the expiration of his short term medical leave he would be eligible for permanent disability ("long term medical leave").

12. On or about July 26, 2006, the Social Security Administration held in a written decision that plaintiff became permanently disabled on July 31, 2004. A copy of the decision is

3

annexed hereto as Exhibit "A" and made a part hereof and to which this Court is respectfully referred for the full force, tenor and effect thereof.

13. On or about September 2, 2004, while on short term medical leave, Newsday without cause, wrongfully terminated plaintiff from his employment for the reasons set forth in a termination letter from Newsday, annexed hereto as Exhibit "B" and made a part hereof, to which this Court is respectfully referred for the full force, tenor and effect thereof, and which provides in part:

> I am writing to confirm the termination of your employment with Newsday effective September 2, 2004. As you were advised yesterday, the reasons for your termination are based on your participation in fraudulent circulation practices, your failure to be forthright with company attorneys during the investigation, and your violations of the company's Code of Conduct.

14. Under the terms of Newsday's Disability Plans Summary Plan Description ("Disability Plan") to which plaintiff was subject, plaintiff was entitled to receive his full salary while on short term disability beginning on or about August 18, 2004 and for twenty six (26) weeks thereafter i.e. until on or about February 24, 2005. A copy of the Newsday Disability Plan is annexed hereto as Exhibit "C" and made a part hereof, to which this Court is respectfully referred for the full force, tenor and effect thereof.

4

15.  Following the expiration of the twenty six (26) week
short term disability period plaintiff was entitled, under the
Disability Plan to receive long term disability benefits while
totally disabled for the balance of his life.

16.  By letter dated October 5, 2004, a copy of which is
annexed hereto as Exhibit "D" and made a part hereof,
plaintiff's prior attorney affirmed that notwithstanding his
wrongful termination as hereinafter described, plaintiff had the
right under the Disability Plan to continue to receive short
term disability benefits.

17.  By letter dated October 26, 2004, a copy of which is
annexed hereto as Exhibit "E" and made a part hereof, Newsday
notified plaintiff that it would terminate plaintiff's short
term disability benefits.

18.  On or about December 12, 2007, Newsday signed a
Deferred Prosecution Agreement with the United States
government, a copy of which is annexed hereto as Exhibit "F" and
made a part hereof, pursuant to which Newsday admitted to
fraudulently overstating Newsday's circulation figures
("fraudulent circulation practices"). Newsday specifically
admitted that it:

> Violated federal criminal law by engaging in
> schemes that defrauded their advertisers, by
> systematically inflating paid circulation
> numbers reported in their books and records
> and falsely representing the accuracy of the

5

inflated numbers to the Audit Bureau of
Circulations ("ABC"), an industry
organization.

19. Notwithstanding Newsday's allegation in its
termination letter of September 3, 2004 that plaintiff was
terminated for allegedly participating in Newsday's fraudulent
circulation practices; failing to be forthright with Newsday's
attorneys during its own investigation of Newsday; and, for
violation of Newsday's Code of Conduct, plaintiff was unlawfully
terminated, as the allegations in the termination letter were
untrue, wrongful, fraudulent and made with the fraudulent intent
of terminating plaintiff's employment while on disability and
terminating plaintiff's disability benefits.

20. In truth and in fact plaintiff was never called or
subpoenaed by the U.S. Attorney and was never accused of fraud
or to have participated "in fraudulent circulation practices;"
and, if plaintiff had done so, and Newsday's attorneys had a
suspicion that he had done so, the U.S. Attorney who prosecuted
Newsday for its fraudulent circulation practices would have
immediately notified plaintiff and Newsday.

21. In addition, plaintiff was absolutely truthful in his
interviews with Newsday's attorneys during their investigation
into Newsday's fraudulent circulation practices and answered
each of the questions directed to him despite his fear that

6

Newsday's managers and attorneys were attempting to set him up
as a participant in Newsday's fraudulent.

22.   In addition, plaintiff has never engaged in wrongful
conduct while employed by Newsday in violation of Newsday's Code
of Conduct which reads in pertinent part as follows:

> Employees should talk to supervisors,
> managers or other appropriate personnel about
> observed illegal or unethical behavior and
> when in doubt about the best course of action
> in a particular situation. It is the policy
> of the Company not to allow retaliation for
> reports of misconduct by others made in good
> faith by employees. Employees are expected to
> cooperate in internal investigations of
> misconduct. (Emphasis added.)

23.   In truth and in fact and to the knowledge of Newsday,
plaintiff did during the course of his employment observe
illegal and unethical behavior by Newsday employees and did
oppose such behavior, and did report it to his superiors,
notwithstanding their threats of retaliation and termination.

24.   The sole reason that Newsday terminated plaintiff
while he was on disability and not found to have participated in
fraudulent conduct was to prevent him while disabled from
receiving short term disability benefits for twenty six (26)
weeks and life time long term disability benefits.

25.   Newsday discriminated against plaintiff by terminating
him solely because of his absence from employment while on

7

disability in order to deprive him of his short term and long term disability benefits.

26. As a result of the foregoing, Newsday has violated Human Rights Law §296(1)(a) which reads as follows:

> 1. It shall be an unlawful discriminatory practice:
> (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, <u>disability</u>, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or <u>to discharge from employment</u> such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. (Emphasis added.)

27. Plaintiff is and has been since July 31, 2004 totally disabled from employment.

28. If plaintiff had not been wrongfully terminated he was and would have been entitled to $1,332.66 a week while on short term disability and $934.60 a week while on long term disability, plus additional benefits including but not limited to health insurance, dental coverage, life insurance, pension benefit plan and employee stock option plan until the present time.

29. By reason of Newsday's unlawful discriminatory practices, plaintiff has been damaged in the sum of at least one million six hundred thousand ($1,600,000.00) dollars with lawful interest thereon.

WHEREFORE plaintiff demands judgment as follows:

(a) Damages in the amount of one million six hundred thousand ($1,600,000.00) dollars with lawful interest thereon; and

(b) Such other and further relief as to this Court may seem just and proper together with the costs and disbursements of this action.

Dated: Queens, New York
      June 3, 2010

Giaimo Associates, LLP
Attorneys for Plaintiff
80-02 Kew Gardens Road
Kew Gardens, N.Y. 11415
(718)261-6200

9

VERIFICATION

STATE OF NEW YORK )
                 )ss.:
COUNTY OF QUEENS  )

I, JOSEPH O. GIAIMO, an attorney admitted to practice before all of the Courts of the State of New York, state that I am a member of the firm, Giaimo Associates, LLP, the attorneys of record for the plaintiffs in the within action; I have read the plaintiff's Amended Verified Complaint and the contents thereof, and the same is true to my own knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters believe them to be true. The source of my information and the grounds for my belief as to matters not therein stated upon my knowledge are papers and communications contained in the file and conversation with the plaintiffs.

The reason I make this verification instead of plaintiff is that plaintiff resides in a County other than the one in which deponent's law firm maintains its office.

I affirm that the foregoing statements are true under penalties of perjury.

Dated: Queens, New York
       June 3, 2010

                              Joseph O. Giaimo

**EXHIBIT A**

## SOCIAL SECURITY ADMINISTRATION
## Office of Disability Adjudication and Review

### DECISION

**IN THE CASE OF**                                   **CLAIM FOR**

                                                    Period of Disability and
Gerard E. Schultz                                   Disability Insurance Benefits
(Claimant)

                                                    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
(Wage Earner)                                       (Social Security Number)

On October 25, 2004, the claimant filed an application for a period of disability and disability insurance benefits. The claim was denied initially and a request for hearing was timely filed. To adjudicate this matter, a hearing was held in Jericho, New York, on July 25, 2006. The claimant appeared at the hearing, represented by Michael T. Sullivan, Esq. Also present at the hearing was Dr. Jody Greenfield, who testified in his capacity as a medical expert.

### ISSUES

The issue in this case concerns whether the claimant is entitled to a period of disability and disability insurance benefits under sections 216(i) and 223 of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

### EVALUATION OF THE EVIDENCE

The claimant alleges disability beginning on July 31, 2004 due to a back impairment. He is a forty-six year old individual with two years of college education and skilled, sedentary past relevant work experience as a manager. He met the insured status requirements of the Social Security Act on July 31, 2004, the date he alleged that he became unable to work, and continues to meet them until December 31, 2008. He has not engaged in substantial gainful activity at any time since July 31, 2004, the date he alleges his disability began.

The claimant has medically determinable severe impairments consisting of lumbar disc disease and radiculopathy and status post lumbar fusion. He does not have an impairment, or combination of impairments, that meets or equals the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. A determination must be made as to whether he retains the residual functional capacity to perform the requirements of his past relevant work or can adjust to other work.

CONFIDENTIAL                                    SK 0030

Dr. Greenfield reviewed all of the medical evidence and testified that he claimant has a long
history of low back pain due to a motor vehicle accident in 2001 (Exhibit 1F). The claimant has
been under the care of Dr. James Farmer, a spinal surgeon, since April 2002 (Exhibit 6F). In
May 2002, he underwent lumbar fusion surgery and continued to have pain with prolonged
sitting and standing (Exhibit 4F). The claimant stopped work in July 2004 and underwent IDET
procedure in August 2004. He is considering repeat surgery. Citing Exhibits 11F and 14F, Dr.
Greenfield testified that has clinical signs including low back pain radiating to the buttocks with
numbness and limited range of motion. EMG testing revealed chronic right L4-5 radiculopathy
(Exhibit 15F, page 4). MRI of the lumbar spine showed facet arthrosis at L1-2 to L4-5 and
spondylolisthesis at L5-S1 (Exhibit 15F, page 4). In an assessment dated June 27, 2006, Dr.
Farmer reported that the claimant's symptoms limited his ability to function and opined that he
could lift and carry ten pounds, sit for three hours in an eight-hour workday and stand and walk
for three hours in an eight-hour workday (Exhibit 14F). Similar findings were reported by the
orthopedic consultative examiner that the claimant has marked limitations in standing, lifting and
prolonged sitting (Exhibit 11F). The claimant's signs and symptoms have not improved despite
surgery and pain management including an IDET procedure (Exhibit 12F, page 114). In the
opinion of the medical expert, the claimant has a reduced residual functional capacity for lifting
and carrying up to ten pounds, standing and walking for three hours in an eight-hour workday
and sitting for three hours in an eight-hour workday.

The Administrative Law Judge has considered the medical opinions of record. Great weight has
been accorded Dr. Greenfield's opinion as he is a board-certified internist familiar with Social
Security Administration Law and Regulations, he reviewed the entire medical record, and he
expressed an opinion that is well-supported by medical findings. Similarly, less weight has been
given to the state agency review physician's opinion that the claimant is capable of performing
sedentary work as this physician never examined the claimant and his opinion is inconsistent
with the overall medical record (Exhibit 10F).

The Administrative Law Judge has also considered the claimant's statements regarding his
condition and inability to work. The Administrative Law Judge finds the claimant's statements
credible as he suffers from an impairment which can reasonably be expected to produce the
symptoms he alleged (Social Security Ruling 96-7p).

Based on all the evidence and the testimony of the medical expert, the undersigned concludes
that the claimant has the residual functional capacity to lift and carry ten pounds, sit for three
hours in an eight-hour workday and stand and walk for three hours in an eight-hour workday. In
his former work as a manager, he was required to perform job demands far in excess of his
current abilities. As he has demonstrated that he lacks the residual functional capacity to
perform the requirements of any past relevant work, the burden shifts to the Social Security
Administration to show that there are other jobs that the claimant can perform. This
determination is made in conjunction with the medical-vocational guidelines of 20 C.F.R. Part
404, Subpart P, Appendix 2. The claimant's exertional limitations materially compromise his
remaining occupational base to the extent that he cannot perform any alternative substantial
gainful activity existing in significant numbers in the national economy. In accordance with a

CONFIDENTIAL                                                                        SK 0031

finding that the claimant has been under a disability beginning July 31, 2004, he is entitled to disability insurance benefits on the basis of his application filed on October 25, 2004.

## FINDINGS

After careful consideration of the entire record, the undersigned makes the following findings:

1.  The claimant met the insured status requirements of the Social Security Act on July 31, 2004, the date he became unable to work, and continues to meet them until December 31, 2008.

2.  The claimant has not engaged in substantial gainful activity since July 31, 2004.

3.  The medical record establishes the presence of severe impairments consisting of lumbar disc disease and radiculopathy and status post lumbar fusion.

4.  The claimant does not have an impairment, or combination of impairments, that meets or equals the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  The claimant's statements regarding his conditions and inability to work are credible.

6.  The claimant has the residual functional capacity to lift and carry ten pounds, sit for three hours in an eight-hour workday and stand and walk for three hours in an eight-hour workday.

7.  The claimant cannot perform the job demands of his former work as a manager.

8.  The claimant is forty-six years old with two years of college education and skilled work experience.

9.  The claimant's exertional limitations materially compromise his remaining occupational base to the extent that he cannot perform any alternative substantial gainful activity existing in significant numbers in the national economy.

10. The claimant has been disabled since July 31, 2004.

CONFIDENTIAL

## DECISION

It is the decision of the Administrative Law Judge that, based on the application filed on October 25, 2004, the claimant is entitled to a period of disability commencing July 31, 2004 and to disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act.


Joseph Halpern
Administrative Law Judge

7/26/2006
Date

CONFIDENTIAL

SK 0033

**EXHIBIT B**


**Newsday**

A TRIBUNE PUBLISHING COMPANY

September 3, 2004

235 Pinelawn Road
Melville, New York 11747
tel: 631/843-3485
fax: 631/843-5218
katie.lawler@newsday.com

**Katie Lawler**
Vice President, Human Resources
and Labor Relations

## VIA OVERNIGHT MAIL

Mr. Gerry Schultz
66 Grasslands Circle
Mt. Sinai, NY 11766

Re:Status of Employment

Dear Gerry:

I am writing to confirm the termination of your employment with Newsday effective September 2, 2004. As you were advised yesterday, the reasons for your termination are based on your participation in fraudulent circulation practices, your failure to be forthright with company attorneys during the investigation, and your violations of the company's Code of Conduct.

I have enclosed two checks from Prudential representing the state disability benefits portion of the disability pay from August 16 through September 5 (totaling $675.00). Please note that your disability pay has been approved through September 23, 2004 (see enclosed letter sent to you from Prudential).

The Tribune Benefit Service Center will be forwarding information to you regarding the status of your benefits, including your retirement benefits (pension and 401(k)). You can contact the Benefit Service Center directly at 1-800-872-2222.

You will have the opportunity to elect to continue medical, dental and vision insurance coverage through COBRA. You will be receiving COBRA information from the company's COBRA administrator (CobraServe) within 15 days.

Additionally, you will have the opportunity to convert your company-provided life insurance coverage, any optional life and/or dependent life insurance coverage. You must contact the Benefit Service Center within 31 days of your separation date to elect this coverage.

Please contact me if you have any questions.

Sincerely,

Katie Lawler

Enclosure
cc: Personnel File

EXHIBIT

**EXHIBIT C**



# TRIBUNE COMPANY

# DISABILITY PLANS

Summary Plan Description

1992

## INTRODUCTION TO YOUR DISABILITY BENEFITS

A disability can have a big impact on your life. It affects not only your health, but also your personal finances. While you're off the job, everyday living expenses continue just as before. That's why Tribune Company has a disability program — to provide you with an income while you're unable to work.

The disability program provides you with these coverages:

- Paid Sick Days Program, which pays your regular salary when you're out for a day or two.
- Short-Term Disability Program (STD), which replaces a part of your pay for up to 26 weeks during your disability.
- Long-Term Disability Plan (LTD), which pays benefits if your disability is more serious.

This booklet is a summary of your sick pay and disability benefits for the eligible employees described on page 1. Certain employees covered by collective bargaining agreements may have different benefits described in separate booklets.

The LTD Plan is based on official legal contracts. If there is a disagreement between this booklet and those documents, the legal documents will always govern. In addition, nothing in this booklet says or implies a contract of employment between you and the company. Tribune Company also reserves the right to change, amend, or terminate these plans and contribution rates at any time.

If you have any questions after you've read this booklet, contact your benefits representative.

# TABLE OF CONTENTS

Page

Plan Participation and Cost ..................................................1
    Plan participation ...............................................1
    Plan cost and funding .........................................1

Paid Sick Days Program ......................................................2

Short-Term Disability Benefits...............................................3
    Filing STD claims..............................................3
    Important points................................................4
    If you have more than one disability ..................4
    When benefits are not paid ..............................4
    If you're disabled while on leave .....................5
    If you're disabled during vacation....................5
    Vacations and holidays .....................................5
    Payroll deductions during short-term disability ..........5

Long-Term Disability Benefits.................................................6
    When benefits are paid .....................................6
    Total disability .................................................6
    Sources of LTD benefits ...................................6
    Maximum benefits.............................................7
    LTD payment examples.....................................7
    A note on social security benefits......................7
    Adjustment of benefits.......................................8
    If you have a mental or nervous disorder.................8
    Pregnancy .........................................................8
    Rehabilitation benefits.......................................8
    Death benefits ..................................................8

Situations Affecting LTD Benefits ..........................................9
    Duration of benefits ..........................................9
    If you have more than one disability ..................9
    When benefits are not paid .............................10
    When you return to work .................................10
    When you reach retirement .............................10
    When coverage ends.......................................10

How Disability Affects Your Other Benefits .....................11
    While receiving STD benefits .........................11
    While receiving LTD benefits.........................11

Filing a Claim .....................................................................12
    Filing LTD claims............................................12
    Paying taxes on your benefits..........................12
    If an LTD claim is denied ...............................12

Other Situations ... ........................................................13              Page

    Attachment of benefits......................................13
    If your LTD benefit is overpaid ..................................13
    If the plans end.................................................13

Administrative Information..........................................14
    Plan sponsor and administrator ..................................14
    Plan type, number, and year ....................................14
    Claims processors ...............................................14
    Plan trustee.....................................................15
    Agent for service of legal process ................................15
    Employee Retirement Income Security Act...............15

Your Rights Under ERISA ........................................16

## PLAN PARTICIPATION AND COST

> Once you're eligible, you participate in the plans automatically.

The Tribune employee benefits program provides plans that continue all or part of your pay while you have to be away from work because of a disability. The Paid Sick Days Program and the Short-Term Disability Program are salary continuation company pay policies. The Long-Term Disability Plan is an employee welfare plan under the Employee Retirement Income Security Act (ERISA).

The Short-Term Disability Program is administered by MedEval and is paid through payroll. The Long-Term Disability Plan is administered by CNA Insurance, self-insured by Tribune Company and paid through a tax-qualified trust at Northern Trust.

### Plan participation

Eligible employees are full-time employees, other than those who are covered by collective bargaining agreements under which benefits were bargained in good faith and whose participation in the programs is not required by a collective bargaining agreement. You're a full-time employee if you work the number of hours in the company's normal work week (but not less than 30).

- Your participation in the Paid Sick Days Program begins automatically on the first day you join the company.
- You are eligible for the Short-Term Disability Program (STD benefits) after you complete one year of continuous full-time service.
- You are eligible for the Long-Term Disability Plan (LTD benefits) if you are at least age 18 and have completed one year of continuous full-time service. If you've already completed one year of service by your 18th birthday, you'll automatically be covered by the plan at age 18.

For the purposes of these plans, "continuous service" means one consecutive 52-week period of full-time work.

If you're not at work on the date your coverage is scheduled to start, coverage will begin on the day you return to full-time work.

### Plan cost and funding

Tribune Company pays the full cost of your disability benefits.

Paid sick days and STD benefits are paid through general company assets. LTD benefits are paid from a trust established for this plan. The trust is funded by company contributions, which are actuarially determined. For more information on the trust fund, see the "Administrative Information" section.

1

## PAID SICK DAYS PROGRAM

> The Paid Sick Days Program continues your regular pay for up to five working days.

Colds and flu are facts of life. When personal illness or injury keeps you away from work for a relatively short period of time, your pay continues with the Paid Sick Days Program.

The program continues your regular pay for up to five working days per calendar year. Your benefits begin the first day you're absent.

If you're a new employee, your sick days are prorated during your first calendar year with the company, as follows:

| If you're hired in: | Your prorated days equal: |
|---|---|
| January or February | 5 |
| March or April | 4 |
| May, June, or July | 3 |
| August or September | 2 |
| October or November | 1 |
| December | 0 |

If you're absent from work for any reason, your supervisor should be notified (before the start of your work day) of the reason and how long you expect to be away.

Your sick days can be used if you're away from work to have medical or dental surgery. However, these benefits don't cover time off from work for medical or dental appointments, or to care for any dependents that are ill or injured.

Sick days are granted each year. You cannot carry unused sick days over to the next year.

The company reserves the right to require medical documentation for paid sick days. Absence of requested documentation may result in an unpaid absence.

## SHORT-TERM DISABILITY BENEFITS

> The STD Program continues a percentage of your pay during a temporary disability.

Short-term disability means absence from work for a medically-certified reason, for example, the flu, a broken leg, or childbirth. The Short-Term Disability Program provides you with income starting on the eighth consecutive day you're temporarily disabled. Disability means the complete inability, due to illness or injury, to perform the duties of your regular occupation. In order to receive short-term disability benefits, you must complete the eligibility requirements described on page 1.

Beginning on the eighth consecutive day of an illness or injury, you'll receive all or a portion of your pay for a certain period of time. This waiting period includes weekends. For example, if you break an arm on a Saturday, your waiting period would begin on that day — not the following Monday. Your disability will need to be verified by a doctor. Tribune Company reserves the right to request that you be examined by a physician of our choice, at our expense. Failure to cooperate with this request may result in termination of benefit payment. You'll receive pay according to this schedule:

| Your Years of Employment | Weeks at 100% of Pay | Weeks at 60% of Pay | Total Weeks |
|---|---|---|---|
| 1-4 | 6 | 6 | 12 |
| 5-9 | 13 | 13 | 26 |
| 10 or more | 26 | 0 | 26 |

As shown here, once you exhaust the period of full pay (as determined by your years of employment), you'll receive 60% of your pay for a period of time. If your disability continues for 26 consecutive weeks, it's possible that the long-term disability plan will step in, as described on page 6.

For purposes of the STD Program, "pay" includes your base salary and commissions at the time of the disability as well as any amounts you are contributing to company plans on a before-tax basis (such as the SIP, or to the company's health care plans). Commissions are calculated as the average of the 12-month period before your disability started. It does not include bonuses, overtime pay, or special allowances.

### Filing STD claims

To ensure that STD benefits are paid from the eighth consecutive day of your disability, you should contact your benefits representative and request an STD Application form. After you and your doctor complete the form, return it to the benefits representative. The benefits representative will send your claim to MedEval, a third-party claim review company that specializes in objective medical review of STD claims. MedEval will discuss your claim with your doctor's office and make a recommendation to the benefits representative on the length of disability. STD benefits will then be paid to you for the time approved by MedEval.

If it appears your disability will last longer than originally anticipated, you can file an STD Request for Extension form.

Important points

Here are some important points you should keep in mind.

- Sick pay covers the first five consecutive work days and short-term disability begins on the eighth consecutive calendar day.
- If you suffer a disability after you have used all five of your sick days, your STD benefits won't begin until the eighth consecutive calendar day of the disability. You'll receive no pay until that time.
- If you are away from work on STD before you have five years of service, you'll receive benefits for up to 12 weeks. See the chart above. If your disability continues longer than 12 weeks, you will not receive further STD benefits. If you are still disabled after a total of 26 weeks, you may be eligible for long-term disability benefits.
- Some states (such as New York, New Jersey, and California) provide state disability benefits. If you live in one of these states, the STD Program will only pay the difference between your state disability benefits and the above schedule, if our program would pay more.

If you have more than one disability

If you recover from your illness or injury, return to work, and the same or a related condition occurs within two weeks, it will be considered the same disability. STD benefits will begin again immediately, in the same amount you had previously been receiving.

If you return to work from a short-term disability and subsequently suffer from another disability within a six-month period, you pick up on the benefit schedule remaining from the previous disability. This new period of disability is subject to the waiting period — regardless of the nature of the disability. In other words, you must return to work full time for at least six months before the full benefit period is reinstated.

Pregnancy, including childbirth, abortion, or miscarriage, is considered and treated the same as any other disability.

Benefits aren't payable if your illness or injury is related to another job or covered by workers' compensation laws.

You will be asked to submit medical proof of your disability at least once a month for benefits to continue.

When benefits are not paid

STD benefits will not be paid for:

- Any absence not medically certified by a company-approved doctor;
- A disability beginning during an unpaid leave of absence;
- A disability beginning during vacation or other paid absence if the disability did not require a doctor's care;
- Routine medical examinations or nondisabling dental care;
- An absence due to misconduct;
- An absence while you are earning wages elsewhere during the hours you were scheduled to work for the company;
- A period of disability continuing beyond the date of your planned termination that has been communicated to the company; or
- A period of disability after your employment has been terminated.

4

Benefits also won't be paid for disabilities resulting from:

- War, whether declared or undeclared, acts of war, or military service (this exclusion does not apply to participants who incur disabilities on account of performing news correspondent duties when assigned to cover war, acts of war, insurrection, rebellion, riot or civil commotion);
- Intentionally self-inflicted injury;
- Committing or trying to commit a crime or engaging in an illegal occupation;
- Participation in an insurrection, rebellion, riot, or civil disturbance;
- A participant's employment with another employer; or
- A disability for which you were not treated by a licensed doctor.


### If you're disabled while on leave

You won't receive short-term disability benefits if you become disabled while on an unpaid leave of absence. If you're still disabled at the end of your leave, benefits will start on the eighth calendar day after your planned return to work.

If you're receiving short-term disability benefits when your leave begins, payments will continue provided you give satisfactory proof of your disability. Payments will continue to be made until the earlier of:

- The date you are allowed to return to work by a company-approved doctor; or
- The date you have received benefits for the maximum amount allowable according to the schedule on page 3.


### If you're disabled during vacation

If you're disabled while on vacation, notify the company. If the disability is medically certified, you'll be taken off vacation and will be eligible for benefits. As with any illness or injury, you will need to provide medical evidence of your disability.


### Vacations and holidays

It is important to note that at year end, STD benefits will be interrupted to allow vacation days to be paid. Thereafter, STD benefits will resume. Your benefits representative and department supervisor are responsible for seeing that vacation is paid before year end.

Holidays are paid as short-term disability days and are not duplicated.

In any event, you can never receive both vacation pay and short-term disability benefits for the same period of time.


### Payroll deductions during short-term disability

Most of your normal payroll deductions will continue while you receive benefits from this plan. This includes taxes, social security, Savings Incentive Plan contributions, and medical, dental, group life, and accident insurance contributions. If you wish to stop any allowable deductions while you are receiving STD benefits, contact your benefits representative.

5

## LONG-TERM DISABILITY BENEFITS

> LTD benefits can start after you've been disabled for 26 consecutive weeks.

If you meet the eligibility requirements described on page 1, long-term disability benefits can begin after you've been totally disabled for 26 consecutive weeks. You'll receive short-term disability benefits during all or part of the waiting period according to your service, as explained on page 3.

If you have a pre-existing condition, benefits may be delayed. Generally, a pre-existing condition is any condition which was diagnosed, or for which you received medical attention, services, or physician-prescribed drugs during the three-month period before you become eligible to participate in the plan.

If your total disability is caused by a pre-existing condition and begins during the first 12 months of coverage, the plan will not pay benefits. If your total disability is caused by a pre-existing condition and occurs after the first 12 months of coverage, the plan will pay a disability benefit subject to any other plan limitations that may apply.

### When benefits are paid

Before LTD payments can start, your total disability will need to be medically certified by a company-approved doctor. It must be considered long-term or permanent and must have existed for 26 consecutive weeks. You must have your doctor complete a certificate — which will be mailed to you — and return it to your benefits representative. To continue receiving benefits, your doctor must complete new certificates semiannually, or more often, if requested. And, you may be required to be examined by a designated company-approved physician. Any such examination is at the company's expense. Failure to cooperate with this request may result in termination of benefit payments.

### Total disability

For a disability to be considered a "total disability," it must be due solely to an injury or disease and require a doctor's regular care and:

- During the first two consecutive years, the disability must make you unable to perform the duties of your job with the company.
- After that, the disability must make you unable to perform any job for which you are or may become reasonably qualified by education, training, or experience.

### Sources of LTD benefits

Tribune Company's plan works with other sources to replace up to 60% of the pay you were earning before becoming disabled.

For purposes of the plan, "pay" means your base salary and commissions as of the date your total disability begins (including any before-tax contributions you are making to any company-sponsored plans). Commissions are calculated as the average of the 12-month period before your disability started. Pay does not include bonuses, overtime pay, deferred compensation, stock options, severance pay, or special allowances.

6

You may be eligible for disability benefits from several sources. Since the company pays part or all of the cost for other benefits you might receive if you're disabled, the amount of those benefits will be included when figuring your LTD plan benefit. Sources of other benefit payments are:

- Workers' compensation, occupational disease laws, or other disability legislation;
- Social security disability or retirement benefits received by you and your dependents;
- Government or other group insurance plans;
- The Tribune Company pension plan; and
- Income from any employer, or from any job for pay or profit.

The company makes up the difference between the amounts you receive from these other sources and 60% of your base pay. If you are eligible for family social security benefits, the total from all sources can equal only up to 75% of your base pay.

## Maximum benefits

The maximum monthly LTD benefit is $10,000.

## LTD payment examples

Here are several examples of how you could receive LTD benefits depending on the amount of disability income you receive from other sources. (You apply to the other sources, and they'll determine benefits first.) In all the examples, suppose your pay is $2,000 a month; the differences occur when the social security amounts vary. Differences can also occur when there are other sources of income as listed above.

| | Example 1 | Example 2 | Example 3 | Example 4 |
|---|---|---|---|---|
| Pay per month | $2,000 | $2,000 | $2,000 | $2,000 |
| Income you're eligible to receive from social security | | | | |
| — Primary | 300 | 0 | 300 | 500 |
| — Family | 0 | 0 | 150 | 350 |
| Tribune Company benefits | 900 | 1,200 | 900 | 650 |
| Total disability income | $1,200 | $1,200 | $1,350 | $1,500 |
| | (60% of pay) | (60% of pay) | (67.5% of pay) | (75% of pay) |

The plan benefit is 60% of pay, minus your primary social security benefit and other sources of income listed above. If you are eligible for family social security, the maximum amount the plan will pay including all sources of income is 75% of pay.

## A note on social security benefits

Your eligibility for social security disability benefits depends on your illness or injury. In general, these benefits start after you have been totally disabled for five consecutive calendar months.

It's important that you apply for social security benefits. CNA Insurance will assist you in doing so. When calculating your LTD benefit, the company assumes you are eligible for these benefits and deducts an estimated social security benefit amount from your plan benefit. This could have a big impact on the amount of your plan benefit. You'll need to give the company proof if you're not eligible for these benefits.

7

If you apply for social security benefits and your claim is denied, you should send the notice of the denial to CNA Insurance. You will be asked to submit requests for review of the denied claim. CNA Insurance will assist you in filing your request.

Once your social security benefit is determined, it remains the same for purposes of calculating your LTD plan benefit. If your social security payments increase after LTD plan benefits begin, you will receive this increase in full.

### Adjustment of benefits

It's your responsibility to let your benefits representative know if there is any change in your disability income from other sources, such as those listed under "Sources of LTD benefits" on page 6.

### If you have a mental or nervous disorder

If you are totally disabled due to a mental or nervous disorder, benefits are considered as for any other disability, however, you must be hospital-confined in order to continue to receive benefit payment beyond 24 months.

If your disability is caused by alcoholism or drug abuse, benefits will only be paid if you participate in an approved substance abuse rehabilitation program.

### Pregnancy

Pregnancy and childbirth are considered to be disabilities under the plan and are treated in the same way as any other illness or injury.

### Rehabilitation benefits

In some situations, plan benefits will continue while you are receiving pay for work in a rehabilitation program. In order to be eligible for plan benefits, the rehabilitation program must be administered by CNA Insurance. The maximum duration of this program is 24 months.

Once you have returned to work in a rehabilitative employment position, the company will reduce your long-term disability benefit by 50% of the earnings that you receive as a result of such employment.

### Death benefits

If you die while you are totally disabled and have been receiving long-term disability benefits for at least six months, your spouse or dependent children will continue to receive monthly LTD benefits for three months, or until your LTD benefits would have ended — whichever is earlier.

8

# SITUATIONS AFFECTING LTD BENEFITS

> These situations could affect your LTD benefits.

### Duration of benefits

Several situations could cause your benefits to be delayed or stopped. They're described here.

Benefits will automatically stop if:

- You don't provide satisfactory medical evidence of your disability or refuse a medical examination as required by a company-approved doctor;
- You are no longer totally disabled as determined by a company-approved doctor;
- You die; or
- You reach the maximum period for benefits to be paid.

If you become disabled before your 62nd birthday, benefits from the plan will continue up to age 65 or until you are no longer disabled. If you become disabled after your 62nd birthday, benefits will continue under the following schedule or until you begin receiving pension benefits:

| Age at Disability | Benefits Are Paid for |
|---|---|
| 62 | 3-1/2 years |
| 63 | 3 years |
| 64 | 2-1/2 years |
| 65 | 2 years |
| 66 | 1-3/4 years |
| 67 | 1-1/2 years |
| 68 | 1-1/4 years |
| 69 and after | 1 year |

### If you have more than one disability

If you recover from your long-term disability, return to full-time work, and another disability occurs, the date benefits begin depends on when you returned to work. If the second disability occurs:

- Within six months of your return to work, benefits begin immediately; and if you're 62 or older, they last for the amount of disability time you have left from the last disability; or
- After six months of your return to work, benefits begin after another six-month waiting period and continue as if this were your first disability.

9

## When benefits are not paid

Although the plan pays benefits for most disabilities, benefits won't be paid for disabilities resulting from:

- War, whether declared or undeclared, acts of war, or military service (this exclusion does not apply to participants who incur disabilities on account of performing news correspondent duties when assigned to cover war, acts of war, insurrection, rebellion, riot or civil commotion);
- Intentionally self-inflicted injury;
- Committing or trying to commit a crime or engaging in an illegal occupation;
- Participation in an insurrection, rebellion, riot, or civil disturbance;
- A disability for which you were not treated by a licensed doctor;
- An illness or injury that happened while you were working for someone other than the company; or
- An illness or injury that is caused by a pre-existing condition and begins during the first 12 months of coverage.

## When you return to work

In general, you must return to work within three days of when a company-approved doctor releases you to return to active service.

If your disability is longer than six months and you become eligible for benefits under the company's long-term disability plan, you'll be paid for your earned, unused vacation while you were on short-term disability once your LTD benefits start.

## When you reach retirement

If you are eligible for pension benefits when you become disabled, you may want to delay applying for your pension benefit until you are no longer eligible to receive LTD benefits. If you apply for pension before the end of your LTD benefits, pension benefits will be considered another income source and will reduce your LTD benefits.

Otherwise, your disability benefits continue up to the maximums allowed for each plan.

If you are over age 62, LTD will continue for the maximum allowed by the plan.

## When coverage ends

You will no longer be covered by the long-term disability plan if:

- You leave the company;
- You are no longer eligible;
- You enter the armed forces of any country on a full-time basis; or
- The plan ends.

Unlike some of your other benefits, disability can't be converted to an individual policy when your coverage ends.

## HOW DISABILITY AFFECTS YOUR OTHER BENEFITS

In some cases, you continue to be eligible for other benefits during a disability.

When you're away from work because of a disability, here's what happens to your other benefits.

### While receiving STD benefits

While you're receiving STD benefits, a number of benefits — Reimbursement Accounts, medical and dental coverage for you and your eligible dependents and life and accident coverage — continue just as though you were at work. Your coverage under the pension plan continues as though you were at work. If you have a SIP account, it may continue to be invested, and contributions will be accepted.

### While receiving LTD benefits

If you become totally disabled and begin to receive LTD plan benefits, your medical, dental, life and accident insurance coverages continue. Your share of the premiums are deducted from your LTD check.

Under the terms of the pension plan, you will continue to earn benefit service as long as you are on long-term disability. However, without any earnings from payroll, you will not be able to contribute to SIP or the Reimbursement Accounts. Your SIP account will continue to be invested and share in the investment results of the plan. Reimbursements from the Health Care Reimbursement Account will be made for those expenses incurred before your LTD start date. Reimbursements from the Dependent Care Reimbursement Account can be made for expenses incurred before and after the LTD start date.

11

## FILING A CLAIM

> Disability benefits are payable after you submit a claim.

You receive sick pay and short-term disability benefits through the regular payroll system, as long as your illness or injury is reviewed by MedEval and approved by your department.

If you believe your injury or illness will continue for more than five consecutive working days, you should notify your benefits representative. He or she will give you an STD Application form to be completed by you and your doctor.

### Filing LTD claims

In order to ensure that LTD benefits begin after 26 weeks of disability, after you've been away from work because of a disability for 16 weeks, your benefits representative will contact you about filing a claim for LTD benefits and applying for social security disability benefits. CNA Insurance will assist you in this process. You will be asked to fill out another claim form and attach medical evidence of your disability. The company may ask you to submit to a medical examination before benefits are paid and from time to time while you're receiving benefits as proof of your continuing disability. You must let CNA Insurance know whether or not you have been approved for social security disability benefits by providing a copy of the letter you receive from social security.

Remember, the company will estimate any benefits you may be eligible to receive from other sources when calculating your LTD benefit. Once you provide proof of your claim or final claim denial, an adjustment will be made retroactively to your first day of long-term disability. If you file late, or if the determination takes longer than 120 days, the adjustment will be retroactive to the beginning of the social security disability award effective date.

### Paying taxes on your benefits

Taxes will be withheld according to the applicable laws governing disability pay. See your tax advisor for any questions or clarifications you require.

### If an LTD claim is denied

If you file a claim for benefits and your claim is denied, you will be notified within 90 days. If additional time is needed to make a decision, you will be notified of this fact within the 90 days and then notified of the decision within 180 days after you filed your claim. You will have 60 days after you receive notice of a denied claim to request in writing that the plan administrator review the decision denying the claim. The plan administrator will, if requested, permit you to examine any documents relevant to your claim, and permit you to submit additional comments in writing if you should wish to do so. The plan administrator will then notify you of its decision within 60 days after it received your request for review. If additional time is needed to make a decision, you will be notified of this fact within 60 days, and you will then be notified of the plan administrator's decision within 120 days after it receives your request for review.

12

## OTHER SITUATIONS

> These are some situations that could affect all of your disability benefits.

The company's disability plans are designed to provide you with income protection you can rely on. But some situations could affect plan benefits.

- If you don't provide the necessary information on application forms, benefits will be delayed until you do.
- If your address changes while you're receiving benefits and you don't notify the company, benefits may be delayed.
- If you do not have a medical examination required by the plan, benefits could stop.
- If your disability stops, payments stop.

In any event, you should remember that the plan administrator and claims administrator have discretionary authority both to determine eligibility and to make decisions regarding claims under the terms of the plan. If a claim is denied, you have the right to a review, as explained on page 12.

### Attachment of benefits

To the extent permitted by law, all rights and benefits under this plan are exempt from execution, attachment, garnishment, or other legal process for your debts or liabilities.

### If your LTD benefit is overpaid

If your LTD benefit is overpaid any month for any reason, the company has the right to request and receive a lump-sum repayment. The company may, at its option, deduct the amount of excess payments from subsequent monthly benefits payable to or for your benefit.

### If the plans end

The company reserves the right to change, amend, or terminate these plans from time to time, in whole or in part. Should the plans ever be terminated, suspended, or modified, benefits with respect to claims incurred before the plan's termination or modification will be paid under the terms prior to termination or modification.

## ADMINISTRATIVE INFORMATION

General administrative information for the company's disability program can be found here.

### Plan sponsor and administrator

The salary continuation and disability plans described in this booklet are sponsored by:

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
(312) 222-3232

Tribune Company is also the plan administrator. In most cases, the responsibility to administer and interpret the plans and make the final decisions on such issues as eligibility and payment of benefits has been delegated to the Tribune Company Employee Benefits Administrative Committee. Generally, this committee has the responsibility to interpret and enforce plan provisions, determine all questions arising under the plan, and adopt such procedural and other rules as in its opinion may be necessary for the proper and efficient administration of the plan and are consistent with the plan documents. However, most of your day-to-day questions will be answered by your benefits representative.

A number of other employers also participate in the plans. You can get a complete list by writing to the plan administrator. You can also examine the list during normal business hours at the plan administrator's office.

### Plan type, number, and year

Documents and reports for some plans are filed with the United States Department of Labor under two numbers: the company's Employer Identification Number (EIN) and the Plan Number (PN). The EIN for Tribune Company is 36-1880355. The Plan Number is 503. The official plan name is the Tribune Company Group Long-Term Disability Plan.

The Long-Term Disability Plan is considered to be a welfare plan for government purposes. Records are kept on a plan-year basis, which is the same as the calendar year (January 1-December 31).

### Claims processors

Claims are processed through, and initial determination and certain interpretations are made by:

Short-Term Disability
MedEval
1920 Highland Avenue
Lombard, Illinois 60148

Long-Term Disability
CNA Insurance
1707 Orlando Central Parkway
Orlando, Florida 32809

14

### Plan trustee

The Long-Term Disability Plan is funded through the Trust for Employee Welfare Benefit Plans of Tribune Company and its Subsidiaries. The trustee is:

The Northern Trust Co.
50 South LaSalle Street
Chicago, Illinois 60690

### Agent for service of legal process

The agent for service of legal process is Stanley J. Gradowski, Secretary, who may be contacted at the company's main address. Process may also be served on the plan administrator.

### Employee Retirement Income Security Act

Tribune Company's benefit plans are designed to meet the requirements established by the Employee Retirement Income Security Act of 1974 (ERISA) if they are subject to that Act.

The plans will be amended to conform with any changes in the law or government regulations.

## YOUR RIGHTS UNDER ERISA

By law, you have certain rights under the long-term disability plan.

As a participant in the long-term disability plan sponsored by Tribune Company, you're entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). Your rights under ERISA include the following:

- You may visit your benefits representative and examine all plan documents without charge. These may include the annual financial reports, the plan descriptions, and all other official plan documents filed with the United States Department of Labor.

- You may obtain copies of plan documents and other information by writing to the plan administrator. You may be charged a reasonable amount for these copies.

- You automatically receive a written summary of the plan's annual financial reports.

- You may not be discharged or discriminated against to prevent you from obtaining a benefit or exercising your ERISA rights.

- If your claim for a benefit is denied in whole or in part, you'll receive a written explanation from the plan administrator. You have the right to have the plan administrator review and reconsider your claim.

In addition to creating rights for plan participants, ERISA imposes certain duties on the people responsible for the operation of the plan. The people who operate the plan, called "fiduciaries," have a duty to do so prudently and in the best interest of you and other plan participants and beneficiaries.

Under certain circumstances, outside assistance may be necessary to resolve disputes between you and plan officials. For example:

- If you request materials from the company's plan and don't receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $100 a day until you receive the materials — unless the materials were not sent because of reasons beyond the control of the plan administrator.

- If your claim for benefits is denied or ignored, in whole or in part, after a final review, you may file suit in a state or federal court.

- If the fiduciaries misuse the plan's money, or if you're discriminated against for pursuing a benefit or exercising your ERISA rights, you may seek help from the United States Department of Labor or file suit in federal court.

If you file a suit against the plan, the court will decide who should pay costs and legal fees. If you win your suit, the court may order the person you've sued to pay the court costs and legal fees. If you lose your suit, the court may order you to pay the costs and fees if, for example, the court decides your suit was frivolous.

If you have any questions about this statement or about your ERISA rights, you should contact your benefits representative. If you wish, you may contact the nearest area office of the Pension and Welfare Benefit Administration, United States Department of Labor.

# TRIBUNE

## SHORT-TERM DISABILITY POLICY

Revised January 1, 2002

P 00048

## 1. In General[1]

Tribune Company's Short-Term Disability (STD) Policy is designed to continue a percentage of your pay during a qualifying temporary disability. The STD policy provides you with pay continuation for up to 26 weeks starting on the eighth consecutive day after you are temporarily disabled. For purposes of this policy, disability means the complete inability to perform the duties of your regular position, due to an illness or injury. In order to be approved for STD benefits, you must meet the eligibility requirements described below, satisfactorily complete the necessary forms, and have your disability verified by an approved medical doctor.

If you are still disabled after 27 weeks, you may be eligible for Long-Term Disability (LTD) benefits. For information on LTD, consult the Benefits Service Center at 1 (800) 872-2222.

If your injury or illness occurs **while working**, you need to inform your supervisor and the health unit of the circumstances surrounding your injury or illness, as you may be eligible for workers' compensation.

**The following is a summary of the major provisions of the Tribune STD policy. This summary applies to eligible full-time employees of Tribune Company and its business units. Please note that there may be some provisions of this policy that do not apply to union-represented employees. If you have any questions about this policy, please contact Human Resources.**

## 2. Eligibility

Effective January 1, 2002, employees eligible for STD benefits are those with at least six months (26 weeks) of continuous full-time service with the Company. For the purpose of this policy, "continuous full-time service" means one consecutive 26-week period of full-time work. This service requirement is waived for any active full-time employees continuously employed full-time since December 31, 2001. For purposes of the policy, you will be considered a full-time employee only if you are classified as a full-time employee on the payroll records of the Company, notwithstanding any subsequent determination by a court of law or governmental agency.

If you suffer an injury or illness prior to being eligible for STD and go on leave, you will not be eligible for an STD benefit for that injury or illness until you have returned to work and met the above eligibility requirement.

## 3. Filing an STD Claim

In order to file an STD claim, you must first notify your department payroll administrator. Once the payroll administrator is notified of your illness or injury, you will be sent an STD packet. Included in the packet is the STD Initial Application form. Both you and your doctor must complete the form. If you do not sign the form, it cannot be processed. **You must generally return the form to Human Resources within 30 days or your benefits may be denied.**

Keep in mind that an approved medical doctor must be actively treating you in order for you to be eligible for STD. For purposes of this policy, an approved medical doctor is defined as a medical doctor, osteopathic physician, podiatrist or dentist. Employees may be treated by other health care professionals, but the Company will not recognize an STD form completed solely by a non-approved

---

[1] **POLICY CHANGE DISCLAIMER:** Tribune and its affiliates reserve the right to change, amend or terminate the STD policy from time to time, in whole or in part. Should the STD policy ever be terminated, suspended or modified, benefits with respect to claims incurred before the policy's termination, suspension, or modification will generally be paid under its terms in effect prior to termination, suspension or modification.

Tribune has the power to construe and interpret the policy and to determine all questions arising with respect to its administration at its complete discretion, including the power to determine the rights and eligibility of employees, participants and their beneficiaries, and the amount, manner and time of payment of any benefits hereunder, and to remedy ambiguities, inconsistencies, and omissions.

1

P 00049

medical doctor, including a psychologist, chiropractor, nurse practitioner, social worker or midwife, unless otherwise mandated by law. If you are not under the direct and continuous care of an approved medical doctor or if you are not following a course of treatment prescribed by your healthcare provider, your STD benefit may be denied and/or stopped.

When your primary disabling diagnosis is a psychiatric one (for example, anxiety, major depression, bipolar disorder), a psychiatrist must complete the STD paperwork in order to receive STD benefits for any STD leave that exceeds 2 weeks. Thus, if your primary care physician completes your initial STD paperwork for a psychiatric illness and it is deemed likely that your disability will exceed 2 weeks, you must obtain referral/consultation and/or follow-up evaluations from a psychiatrist for ongoing disability determinations. Your treating psychiatrist would then be responsible for completing all subsequent STD extension forms. Failure to do so can lead to a denial or disruption in your disability payments.

The primary disabling diagnosis is defined as that diagnosis which is the major diagnosis that prevents you from working. A psychiatrist is a medical doctor (M.D. or D.O.) and therefore can provide psychotherapy and/or prescribe medication, whereas a psychologist is a PhD and can provide psychotherapy, but, in most states, cannot prescribe medication.

Once Human Resources receives the completed application, the Company will then forward your claim to Prudential, the STD carrier. Prudential will review your claim and contact your doctor to verify the information, request medical records, and/or ask any questions necessary to certify that you are disabled. Human Resources and/or Prudential will notify you of the status of your application for STD benefits and request any additional information needed.

If it appears that your disability will last longer than originally anticipated, Prudential will request additional medical information from your treating physician(s). Prudential will review your claim based on the updated information provided by your doctors. Your STD benefit will be suspended until your STD extension period is approved. Each time your STD is extended, Prudential will notify you of the additional approval period. If your request for an extension of STD benefits is not approved, you will be notified and may be expected to return to work.

Pregnancy, including childbirth, abortion or miscarriage, is considered and treated the same as any other disability under this policy. Typically, you receive STD benefits for six weeks after the date of birth of a child, regardless of how you deliver the baby, and after these six weeks, assuming you have no other qualifying disability, you are no longer considered disabled for purposes of this policy and your STD benefit will stop. You may, however, still be eligible for additional unpaid leave under the Family and Medical Leave Act or similar state laws.

If your doctor charges a fee for completing the STD form or sending any necessary medical records to the Company, it is your responsibility to pay the fee. If you do not pay the fee, the processing of your STD claim may be delayed and/or your STD benefits may be denied.

Tribune reserves the right to request that a doctor of its choice examine you at its expense. This is known as an Independent Medical Examination (IME). Failure to submit to an IME will result in the termination of your STD benefits.

If you become disabled while on vacation, you will be taken off vacation and become eligible for STD benefits, assuming you are otherwise qualified for benefits under this policy.

## 4. Waiting Period

The STD policy provides you with benefits starting on the eighth consecutive calendar day you are disabled and absent from work. During the first seven calendar days of approved STD, known as the "waiting period," in order to receive pay, you must use your sick, personal and vacation days, if available. If you have no remaining sick, personal or vacation days, you will not be paid during the waiting period. In most situations, you are required to exhaust your sick days during the waiting period.

2

## 5. STD Benefit

**No STD benefits** will be paid until an approved medical doctor completes the STD certification form and the Prudential approves you for benefits. The amount of the STD benefit for which you are eligible is based on your eligible compensation and the schedule attached to this policy. For purposes of this policy, "eligible compensation" means your base salary, plus, if applicable, commissions. Commissions are calculated as the average commissions earned during the 12-month period before your disability started. If you had not yet earned commissions for 12 months, commissions will be calculated based on the average commissions earned during all of the months you worked for the Company prior to your disability occurring. Eligible compensation excludes bonuses, stock options, overtime pay, special allowances, etc.

Unless otherwise required by law, any change in the amount of your base salary while you are on STD will not affect your eligible compensation and will not be considered to take effect until you have returned to work.

If your STD benefit is overpaid for any reason, you will be required to repay the excess benefit within 30 days of the Company's notification to you of the overpayment. If permitted by law, the Company may, at its option, deduct the amount of any excess payments from your paychecks.

While you are on STD, you will not be paid for any Company holidays or personal days. If you are still certified as disabled but are no longer eligible for STD pay, you will be required to use your remaining sick and personal days, if any.

Some states (for example, New York, New Jersey and California) provide state disability benefits. If you are eligible for a state disability benefit or NYS no fault benefits you **must** inform Human Resources of the benefits you receive. You will only be eligible for an STD benefit so that the **total** benefits you receive from the Company, the state, and no fault auto are equal to the STD benefit you would otherwise receive under the attached Schedule. In other words, the total pay that you receive from state disability benefits and this policy, if any, cannot exceed the benefits set forth in the Schedule. Alternatively, if you receive an STD benefit and then subsequently become eligible for state disability benefits or no fault, you will be required to remit the excess benefit back to the Company.

## 6. Returning To Work

When your doctor releases you to return to work, you must have your doctor complete the Return to Work Release form. You must bring the form with you on your first day back to work, give it to you're the health unit. If you return to work without a fully completed release form, you may not be permitted to return to work, and your absences may be considered to be unexcused.

If you are not yet well enough to return to work at full duty but your doctor has allowed you to return to work with restrictions, contact the Health Unit. If the Company is able to accommodate the restrictions, a return to work date would be determined and the Company would expect you to return to work. Unless otherwise required by law, these restrictions must be temporary and your return to full duty must be anticipated in the near future. Once you return to work, whether with or without restrictions, full-time or part-time, your STD benefits will stop. You must generally follow up with your doctor until you are released to full duty.

If your department is not able to accommodate the restrictions, you would continue on STD for as long as possible under this policy or until you are fully released to return to work. The Company may also work with you to find another position that fits within your restrictions. You would continue to provide STD extension forms from all treating doctors to verify your disability. You will be required to submit the STD forms until the earlier of the time that you are able to return to work or are eligible for long-term disability.

3

This policy is only meant to provide for pay during an otherwise approved leave. Qualifying for benefits under this policy in no way constitutes a guarantee that you will be eligible for leave or that your position will be held open during your leave.

## 7. Multiple Disability Leaves

If you have been disabled for 27 weeks and during that time you exhaust your benefits under this policy, you will not be eligible for an additional full STD benefit until you have returned to work for six consecutive months.

If following a leave where you collected STD benefits you return to work and you become disabled again **within** two weeks of returning to work, STD benefits will begin again immediately, picking up where you left off on the benefit schedule remaining. You will not be subject to the waiting period. If following a leave where you collected STD benefits you return to work, and you become disabled again **after** 2 weeks but within 6 months of returning to work, STD benefits will begin again after another waiting period, picking up where you left off on the benefit schedule remaining.

Disability benefits paid out under a Company business unit policy will be treated as benefits paid out under this policy. For example, if you collected salary continuation from November 1 through December 31, 2001 under a business unit disability pay policy, and then effective January 1, 2002 became eligible for STD benefits under this policy, the weeks of salary continuation you received during 2001 would count toward the STD benefits you may be eligible to receive under this policy.

## 8. When Benefits Are Not Paid

The following are some additional situations where employees will not be eligible to collect STD benefits:

- if the Company determines that you have recovered from your disability;
- If you have exhausted the maximum number of weeks that you are eligible for STD benefits;
- if you have returned to work, including if you are on restricted duty;
- if your injury is covered by workers' compensation;
- if your disability is not serious enough to require a doctor's care, including if you require only routine medical care or non-disabling dental care;
- if you apply for STD during an absence due to misconduct or while you are on disciplinary suspension;
- if you become disabled while you are working for another company during the hours you were scheduled to work for the Company;
- after death;
- during an absence for cosmetic surgery not for reconstructive purposes;
- after you no longer work for the Company;
- if you became disabled while engaging in an illegal activity, or
- if you become disabled while participating in an insurrection, rebellion, riot or civil disturbance, or
- if you become disabled during any period of military activation (this exclusion does not apply to participants who incur disabilities on account of performing news correspondent duties when assigned to cover acts of war or civil commotion).

Your business unit may also apply certain other eligibility exceptions. See attached Schedule.

## 9. Payroll Deductions During STD

Since the STD policy is a salary continuation policy, your normal payroll deductions will continue while you receive an STD benefit. This includes, for example, taxes, social security, insurance, United Way,

4

reimbursement accounts, group legal, retirement savings plan, and Employee Stock Purchase Plan (ESPP). If you are out on STD but have stopped receiving or exhausted the STD benefit, Human Resources will contact you to let you know whether you will be billed for benefit deductions or have them taken out of your paychecks if they resume in the future.

## 10. Family and Medical Leave Act (FMLA)

While you are out on STD, you may be eligible for leave under the Family and Medical Leave Act (FMLA) and applicable state leave laws. FMLA leave, if any, runs concurrently with STD. If you have any questions about FMLA, please see Human Resources.

5

P 00053

## STD SCHEDULE OF BENEFITS

### STD SCHEDULE*

| Years of Employment | Weeks at 100% of Pay | Weeks at 75% of Pay |
|---|---|---|
| 6 mos or more | Weeks 1 through 6 | Weeks 7 through 26 |

\* The schedule begins after the waiting period.

### VACATION

You cannot receive vacation benefits if you are already receiving STD benefits. You may, however, use vacation, sick and personal days if you are out on STD but are not eligible for STD benefits. At the end of a calendar year while you are out on STD, accrued unused vacation is forfeited and cannot be carried over from one year to the next. Moreover, if you have accrued unused vacation when you become eligible for LTD, you will forfeit that vacation unless you return to work in that same calendar year.

In no event can unused sick days, personal days, or holidays be carried over from one year to the next.

### WORKERS' COMPENSATION

If you are injured at work and are eligible for workers' compensation benefits, you will not be eligible for any STD benefits. If you receive any STD benefits and then subsequently become eligible for workers' compensation, you will be required to remit the STD benefits back to the Company.

6

P 00054

**EXHIBIT D**

# GLYNN AND MERCEP LLP

## LAWYERS

NORTH COUNTRY ROAD, P.O. BOX 712
STONY BROOK, L.I., NEW YORK 11790-0712
631-751-5757
www.glynnorlaw.com

ANTHONY W. MERCEP*
TIMOTHY B. GLYNN
LAWRENCE E. KELLY

*N.Y. AND MASS. BARS

BRADLEY C. ABBOTT
MARTIN F. SIMON

OF COUNSEL
BRIAN P. KEIFER*

*N.Y. AND CA. BARS

October 5, 2004

Katie Lawler, Vice President
Human Resources and Labor Relations
Newsday
235 Pinelawn Road
Melville, NY 11747

Re: Gerard Schultz

Dear Ms. Lawler:

We are attorneys for Gerard Schultz who was purportedly terminated effective September 2, 2004, as expressed in your letter dated September 3, 2004. At the time of his termination Mr. Schultz was out on medical disability leave. We request clarification of the company's position.

It appears to us, after review of your Summary Plan Description that Mr. Schultz was eligible for Short Term Disability benefits and should have been receiving full salary under the terms of your plan as of the 8th day of his Disability and would have continued, in Mr. Schultz' case for the maximum of 26 weeks if he were unable to return to work. The seven day waiting period should have been covered by Mr. Schultz sick days. It also appears to us that, having been out on disability at the time of his termination, that his Short Term Disability benefits should continue notwithstanding his termination for as long as he is disabled or until the 26 weeks were used up, the expiration of the Short Term Disability Period.

We note that Mr. Schultz' short term disability has been approved through September 23, 2004. We hereby request that that period be extended. We enclose Mr. Schultz last office visit notes with Dr. Thomas J. Dowling, M.D., F.A.C.S. showing that Mr. Schultz is still totally disabled and requires further surgery. Kindly provide us with any additional requirements you may have to establish his continued disability.

D 0260

Katie Lawler, Vice President
Page 2

October 5, 2004

It further appears to us that his right to receive Long Term Disability payments is unaffected by his termination if his disability period extends into the time such benefits would be applicable.

Kindly confirm our understanding or provide clarification if your understanding is different.

Very truly yours,

GLYNN and MERCEP, LLP



Timothy B. Glynn

TBG/lls
Encl.
cc:     Mr. Gerard Schultz
*Via Facsimile 631-843-5218 and Regular Mail*

D 0261

**EXHIBIT E**

James P. Osick
Director/Senior Counsel
Labor and Employee Relations
312/222-5933

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611-4001
fax: 312/222-3860
e-mail: josick@tribune.com

October 26, 2004

Timothy B. Glynn
Glynn & Mercep LLP
North County Road
P.O. Box 712
Stony Brook, New York 11790-0712

**Re: Gerald Schultz**

Dear Mr. Glynn:

Your letter to Katie Lawler at Newsday regarding Gerald Schultz has been forwarded to me for response.

Newsday terminated Mr. Schultz's employment on September 2, 2004. Under the Company's disability policies, once an individual's employment is terminated, they are no longer eligible for either short term or long term disability benefits. Thus, Mr. Schultz's entitlement to disability benefits ended on September 2, 2004.

Very truly yours,

James P. Osick

RECEIVED
NOV 1 7
HUMAN RESOURCES

D 0257

VERIFICATION

STATE OF NEW YORK )
                 )ss.:
COUNTY OF QUEENS )

    I, JADE L. FULLER, an attorney admitted to practice before all of the Courts of the State of New York, state that I am a member of the firm, Giaimo Associates, LLP, the attorneys of record for the plaintiffs in the within action; I have read the plaintiff's Verified Complaint and the contents thereof, and the same is true to my own knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters believe them to be true. The source of my information and the grounds for my belief as to matters not therein stated upon my knowledge are papers and communications contained in the file and conversation with the plaintiffs.

    The reason I make this verification instead of plaintiff is that plaintiff resides in a County other than the one in which deponent's law firm maintains its office.

    I affirm that the foregoing statements are true under penalties of perjury.

Dated: Queens, New York
      April 6, 2010

                                  Jade L. Fuller

**EXHIBIT F**

AGREEMENT BETWEEN NEWSDAY, INC., HOY PUBLICATIONS LLC, AND
THE U.S. ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF NEW YORK

NEWSDAY, INC. ("Newsday") and HOY PUBLICATIONS LLC, for itself and
as successor-in-interest to HOY, LLC ("Hoy"; (collectively, the "Newspapers"), by Tribune
Company ("Tribune"), the parent corporation and sole owner of the Newspapers, and by the
undersigned attorneys, pursuant to authority granted by the Board of Directors of Tribune, and
the UNITED STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF NEW
YORK (the "Office"), hereby enter into this agreement ("this Agreement"). Except as
specifically provided below, this Agreement shall be in effect for a period of fifteen (15) months
from the date on which it is fully signed and executed.

1.      The Office has informed the Newspapers that each is the subject of an
investigation being conducted by a grand jury sitting in the Eastern District of New York, with
the assistance of the United States Postal Inspection Service (the "Postal Inspection Service"),
the Internal Revenue Service ("IRS") and the Nassau County Police Department ("NCPD").
involving circulation reporting fraud.

2.      Newsday acknowledges that in or about and between 2001 and May 2004,
as set forth in Exhibit A, and Hoy acknowledges that in or about and between 2001 and July
2004, as set forth in Exhibit B, as a result of the conduct of certain Newsday and Hoy executives
and employees, Newsday and Hoy violated federal criminal law by engaging in schemes that
defrauded their advertisers, by systematically inflating paid circulation numbers reported in their
books and records and falsely representing the accuracy of the inflated numbers to the Audit
Bureau of Circulations ("ABC"), an industry organization (collectively, "the Unlawful
Practices")

3.     The Newspapers accept responsibility for their respective conduct by entering into this Agreement and by, among other things, effecting the remedial actions taken to date, maintaining full cooperation with the Office, the Postal Inspection Service, the IRS and NCPD (collectively, the "Investigative Entities"), and undertaking other measures as set forth in this Agreement.

4.     In February 2004, Tribune, on behalf of itself and the Newspapers, engaged the law firm Sidley Austin LLP and instructed the Internal Audit Department of Tribune to conduct an investigation into the circulation-reporting practices of the Newspapers (the "internal investigation"). Through Tribune, the Newspapers have shared the results of that internal investigation with the Office. Newsday and Hoy acknowledge that their respective prior, ongoing and future cooperation, and ongoing remediation, as described in paragraphs 5 and 7, are among the factors involved in the Office's decision to enter into this Agreement, and therefore Newsday and Hoy agree to continue to cooperate fully with the Investigative Entities regarding any matter about which either Newsday or Hoy has knowledge.

5.     Newsday and Hoy agree that the respective cooperation of Newsday and Hoy shall include, but is not limited to, the following:

a.     completely and truthfully disclosing all information that Newsday or Hoy possesses to the Investigative Entities on any subject about which the Investigative Entities may inquire. Should any waiver of privilege be required to make such disclosure, the Office notes that it shall be requested in conformity with the requirements set forth in the United States Department of Justice ("DOJ") Memorandum entitled, Principles of Federal Prosecution of

2

Business Organizations;

      b.     assembling, organizing and or providing any and all information, testimony, documents, records or other tangible material that Newsday or Hoy possesses or has in its custody, or control, as may reasonably be requested by the Office or any of the Investigative Entities,

      c.     using the reasonable best efforts of Newsday and Hoy to make available any present and former employees of Newsday and Hoy to provide information and/or testimony as requested by any of the Investigative Entities, including, without limitation, sworn testimony in court proceedings, as well as interviews with law enforcement authorities. Cooperation under this paragraph shall include identification of witnesses who, to the knowledge of either Newsday or Hoy, may have material information regarding the conduct of Newsday or Hoy, or records which may have material information regarding the conduct of Newsday or Hoy;

      d.     providing any information, testimony, documents, records or other tangible material deemed ~~necessary by any of the Investigative~~ Entities or a court to establish the evidentiary foundation necessary to admit into evidence documents in any criminal or other proceeding; and

      e.     consenting to any and all disclosures of any information, testimony, documents, records or other tangible material provided by the Newspapers to the Office pursuant to this Agreement to any other governmental agency designated by the Office as the Office, deems appropriate, and with respect to any such materials that constitute "matters occurring before the grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal

3

Procedure, consenting to (i) any order sought by the Office permitting such disclosures; and (ii) the Office's ex parte or in camera application for such orders.

      6.    Newsday and Hoy agree to pay a total of $15 million in cash jointly and severally (the "Payment") to settle a civil forfeiture action, brought pursuant to a Verified Complaint in Rem captioned "United States of America v. $15,000,000.00 in United States currency" and that shall be filed in the Eastern District of New York (the "Civil in Rem Action") on the same day as the execution of this Agreement . The Stipulation of Settlement and Decree of Forfeiture pursuant to which the civil forfeiture action shall be settled is attached hereto and its terms are incorporated herein by reference. The Payment shall be made on or before the earlier of December 20, 2007 or ten (10) days after the filing of the Civil In Rem Action (the "Due Date"), either by wire transfer or by certified or bank check. If the Payment is made by wire transfer, it must be completed on or before the Due Date, in accordance with written wiring instructions provided by the Office. If the Payment is made by certified or bank check, it must be made payable to the "United States Marshals Service," and note on its face the docket number of the civil forfeiture action, and be delivered via overnight courier on or before the Due Date to Assistant United States Attorney Kathleen Nandan, United States Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York 11201. The parties understand that under Department of Justice policy, persons who claim restitution for fraudulent circulation reporting by the Newspapers between 2001 and July 2004 and who have not been made whole by settlement with the Newspapers, may apply to DOJ for compensation from funds received from the Payment.

4

7.      Newsday and Hoy represent that in response to the Unlawful Practices
uncovered by the investigation conducted by the Investigative Entities and by the internal
investigation, their current management has taken numerous remedial actions. These remedial
actions (collectively, the "Remedial Actions, Policies and Procedures") include:

a       the termination of employees, including senior managers, at both
Newsday and Hoy, whose improper activities and or lax supervision contributed to a systemic
practice of falsifying paid circulation data and reporting it to ABC;

b.      the institution at both Newsday and Hoy of requirements, enforced by
penalties that include loss of incentive compensation, personal certification by the Chief
Executive Officer and Publisher, Chief Financial Officer and Vice President for Circulation of
the accuracy of reported circulation, and, on a quarterly basis, the completion of detailed
questionnaires signed by the Chief Executive Officer and Publisher, Chief Financial Officer, and
Vice President for Circulation about current practices relating to circulation numbers reported to
ABC.

c.      the addition of circulation audits to the scope of work conducted during
annual internal audits at Newsday and Hoy;

d.      the assignment of the Finance departments at Newsday and Hoy to
exercise joint responsibility with the Circulation departments of the Newspapers to prepare and
verify monthly paid circulation data as well as to review reports of unsold newspapers by
distributors and to establish guidelines limiting use of third-party bulk sales;

e.      the implementation of regular field-testing and auditing by Newsday and

5

Hoy of third-party newspaper distributors ("distributors"), supplemented by requirements that contracts with distributors specify all terms in writing, and that invoices issued to those distributors specify all work requested.

  8.  In consideration of Newsday's and Hoy's respective. (a) acceptance of responsibility for their conduct as acknowledged herein; (b) cooperation to date and agreement to continue to cooperate with the Investigative Entities; (c) agreement to make the payment set forth in paragraph 6 above; (d) implementation of the Remedial Actions, Policies and Procedures; (e) payment of approximately $83 million, to date, to entities that placed ads in Newsday and Hoy in settlement of pending or potential claims related to the Unlawful Practices; and (f) agreement otherwise to comply with all of the terms of this Agreement, the Office agrees that, except as provided in this Agreement, neither Newsday nor Hoy will be prosecuted for the Unlawful Practices.

  9.  Newsday and Hoy understand and agree that should the Office, in its sole discretion, determine that either Newsday or Hoy has deliberately given false, incomplete, or misleading information under this Agreement, has otherwise deliberately violated any provisions of this Agreement or has committed, or attempted to commit, any crimes other than the Unlawful Practices, then that party shall thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including a prosecution relating to the Unlawful Practices. Newsday and Hoy both agree that in the event of the foregoing, any prosecution relating to the Unlawful Practices that is not time-barred by the applicable statute of limitations on the date of this Agreement may be commenced against them in accordance with

6

this Agreement, notwithstanding the expiration of any statute of limitations. By this Agreement, Newsday and Hoy both expressly intend to and do waive any rights in this respect. Such waiver is knowing, voluntary and made after consultation with counsel.

          10.     Newsday and Hoy further understand and agree that in the event the Office, in its sole discretion, determines that either Newsday or Hoy has knowingly violated any provision of this Agreement or has committed or attempted to commit any crimes other than crimes relating to the Unlawful Practices: (a) all statements made by or on behalf of the Newspapers to any of the Investigative Entities, including the acknowledgment and acceptance of responsibility set forth in this Agreement and the exhibits hereto, and any testimony given by that party before a grand jury or elsewhere, whether before or after the date of this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any criminal proceeding brought by the Office against that party; and (b) the same party shall not assert in any criminal proceeding against it brought by the Office any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule or provision, that statements made by or on behalf of that party before or after the date of this Agreement, or any leads derived therefrom, should be suppressed.

          11.     Newsday and Hoy agree that the decision on whether conduct and/or statements of any individual will be imputed to Newsday or Hoy for purposes of determining whether Newsday or Hoy or both violated any provision of this Agreement shall be in the sole discretion of the Office, provided, however, that the statements of any former officer, director or

employee of Newsday or Hoy, made after his or her termination from employment at Newsday or Hoy, shall not be attributed to the Newspapers for the purposes of paragraphs 9-11. Should the Office determine that Newsday or Hoy has committed a knowing breach of any provision of this Agreement, the Office will provide written notice to that party, addressed to its counsel, Thomas McC. Souther, Sidley Austin LLP, 787 Seventh Avenue, New York, NY 10019, or to any successor that it may designate, and will provide it with a two-week period from the date of receipt of such notice in which to make a presentation to the Office to demonstrate that no breach has occurred or, to the extent relevant, that the breach was not knowing or had been cured. Newsday and Hoy understand and agree that the exercise of discretion by the Office is not subject to review in any court or tribunal.

　　　　12.　　Newsday and Hoy agree that they shall not, through their attorneys, Board of Directors, agents, officers or other authorized employees, make any public statement, in litigation or otherwise, contradicting their respective acceptances of responsibility, including the admissions set forth in Exhibit A and Exhibit B. Any such contradictory statement by Newsday or Hoy, their present or future attorneys, Board of Directors, agents, officers or employees shall constitute a breach of this Agreement and the party in breach thereafter shall be subject to prosecution as set forth in this Agreement. The decision as to whether any such contradictory statement will be imputed to Newsday or Hoy for the purpose of determining whether either has breached this Agreement shall be at the sole discretion of the Office. Following notification by the Office to Newsday or Hoy of any such contradictory statement, the party so notified may avoid a breach of this Agreement by publicly repudiating such statement within 72 hours after

8

notification by the Office. This paragraph is not intended to apply to any statement made by any Newsday or Hoy officer, director or employee or former officer, director or employee who has been charged with a crime or other wrongdoing by the government or an agency thereof.

13. If either Newsday or Hoy sells or merges all or substantially all of its business operations as they exist as of the date of this Agreement to or into a single purchaser or group of affiliated purchasers during the term of this Agreement, that seller or merging party shall include in any contract for sale or merger a provision binding the purchaser successor to the obligations described in this Agreement.

14. Newsday and Hoy agree that, following expiration of this Agreement, they will continue to cooperate with the Investigative Entities in connection with any proceeding relating to the Unlawful Practices. Newsday and Hoy shall have no obligation to cooperate if either is a defendant in any such proceeding.

15. Newsday and Hoy agree that this Agreement, including Exhibits A and B hereto, may be released to the public.

16. It is understood that this Agreement is binding only on Newsday, Hoy and the Office, and specifically does not bind any other federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities. However, the Office will bring this Agreement and Newsday's and Hoy's cooperation and the Remedial Actions, Policies and Procedures to the attention of other federal agencies, state or local law enforcement agencies, and any licensing or regulatory authorities if Newsday or Hoy so requests. It is the intent of the parties to this Agreement that this Agreement does not confer or provide

9

any benefits, privileges or rights to any individual or any entity other than the parties hereto, and

that nothing in this Agreement shall be construed as acknowledging that this Agreement,

including Exhibit A and Exhibit B, the evidence underlying this Agreement and Exhibit A and

Exhibit B, shall be admissible in any proceeding other than a proceeding brought by the Office.

No promises, agreements or conditions have been entered into other than those set forth in this

Agreement, and none will be entered into unless memorialized in writing and signed by all

parties. This Agreement supersedes any prior promises, agreements or conditions between the

parties. To become effective, this Agreement must be signed by all signatories listed below.

Dated: December 11, 2007
     Brooklyn, New York

     BENTON J. CAMPBELL
     United States Attorney
     Eastern District of New York

By:

     Cynthia M. Monaco
     Senior Litigation Counsel

Approved By:

     Eric R. Komitee
     Chief, Business and Securities Fraud Unit

     Greg D. Andres
     Chief, Criminal Division

AGREED AND CONSENTED TO BY:

Dennis FitzSimons
Chairman & Chief Executive Officer
Tribune Company, as sole owner of Newsday, Inc. and Hoy Publications LLC

Thomas McC. Souther Esq.
Counsel to Newsday, Inc. and Hoy Publications LLC

11

## EXHIBIT A

In any criminal proceeding brought by the United States Attorney's Office for the Eastern District of New York, the following statement by Newsday, Inc. ("Newsday"), shall be admissible against it pursuant to Rules 801(d)(2) and 804(b)(3) of the Federal Rules of Evidence:

1. Newsday is a New York corporation headquartered and with its principal place of business in Melville, New York. At all relevant times, Newsday published a daily newspaper by the same name, which it sold and distributed throughout the New York metropolitan area, including all five boroughs of New York City, Long Island and New Jersey.

2. The Audit Bureau of Circulation ("ABC") is a not-for-profit organization whose membership at all relevant times included Newsday, and certain of its advertisers. ABC served as an industry watchdog to insure the integrity of paid circulation data submitted by publishers to advertisers. In order to qualify for membership in ABC, a newspaper publisher was required to meet a paid circulation threshold, which was verified through annual audits by ABC. Certain advertisers depended on ABC-audited paid circulation data to negotiate advertising rates with publishers, including certain advertisers in Newsday.

3. From approximately 2001 until May 2004, senior managers of Newsday and subordinate employees under those managers' direction engaged in fraudulent practices that systematically inflated paid circulation numbers reported in Newsday's books and records and falsely represented to ABC that the inflated numbers were accurate. A goal of the scheme was to mislead ABC to verify by audit Newsday's claims that its paid circulation was increasing or at least not declining, and thereby, to induce certain advertisers to pay higher rates than accurate reports by Newsday to ABC would have justified.

4. Among the fraudulent techniques used by Newsday managers and employees to inflate paid circulation numbers that they then reported to ABC was to make incentive and bonus payments to distributors of Newsday newspapers, ostensibly for bona fide performance, that were in fact conditioned on the distributors overstating the number of copies that they had actually delivered and overstating the number of copies that had been returned by retail stores and thus not because those copies had not been sold.

5. As part of this fraudulent technique, Newsday managers directed home delivery agents to lie to ABC auditors tasked to verify the accuracy of the information that the agents were reporting to Newsday and that Newsday was relaying to ABC.

6. As a further part of this fraudulent technique, Newsday managers also compensated a distributor as if it was selling up to 65,000 copies of the newspaper each weekday, and up to 50,000 copies of the newspaper each Sunday when, as the managers knew, at no time did that distributor actually sell more than 10,000 copies in a single day.

7.      In the Spring 2004, Newsday managers sought further to mislead ABC about the distribution operation described in paragraph 6 above.   To convince ABC that the circulation numbers that Newsday had previously attributed to that operation had been accurate, Newsday managers invited ABC auditors to observe a "re-creation" in which Newsday employees were dispatched in the guise of customers to buy newspapers from hawkers stationed at locations throughout Long Island.  This was for the purpose of misleading the auditors into believing that Newsday had actually sold newspapers to real customers when it had not.

8.      Another fraudulent technique used by Newsday managers and employees to inflate paid circulation numbers that they then reported to ABC was to run programs in which newspapers were delivered, without charge, to homes where no one had requested delivery, which the Newsday managers then counted and caused to be counted as paid home subscribers, in violation of ABC rules.

9.      Another fraudulent technique used by Newsday managers and employees to inflate paid circulation numbers that they then reported to ABC was to conceal days in which paid circulation had been less than anticipated by falsely attributing those days to other days that under ABC reporting rules could be excluded from circulation computations.

Dated: December 12, 2007.

_____
Dennis FitzSimons
Chairman & Chief Executive Officer
Tribune Company, as sole owner of Newsday, Inc.

_____
Thomas McC. Souther, Esq.
Counsel to Newsday, Inc.

EXHIBIT B


     In any criminal proceeding brought by the United States Attorney's Office for the Eastern District of New York, the following statement by Hoy Publications, LLC, shall be admissible against it pursuant to Rules 801(d)(2) and 804(b)(3) of the Federal Rules of Evidence:

1.     Hoy Publications, LLC, is a Delaware Corporation that maintained offices in, among other places, Melville, New York, from its creation in January 2004 until approximately May 15, 2007. Between 1999 and May 15, 2007, Hoy LLC and as its successor-in-interest, Hoy Publications, LLC (collectively, "Hoy"), published several Spanish-language daily newspapers. These included a newspaper that was sold and distributed throughout the New York metropolitan area, including all five boroughs of New York City, Long Island and New Jersey ("Hoy New York"), a newspaper that was sold and distributed in Chicago beginning in approximately September 2003 ("Hoy Chicago") and a newspaper that was sold and distributed in Los Angeles beginning in approximately March 2004 ("Hoy Los Angeles") (collectively, the "Hoy Newspapers").

2.     The Audit Bureau of Circulation ("ABC") is a not-for-profit organization whose membership at all relevant times included Hoy and its advertisers. ABC served as an industry watchdog to insure the integrity of paid circulation data submitted by publishers to advertisers. In order to qualify for membership in ABC, a newspaper publisher was required to meet a paid circulation threshold, which was verified through annual audits by ABC. Certain advertisers depended on ABC-audited paid circulation data to negotiate advertising rates with publishers, including advertisers in the Hoy Newspapers. Certain advertisers also considered unaudited paid circulation republished by ABC in deciding whether to advertise in new publications and what advertising rates to accept.

3.     Senior managers of Hoy and subordinate employees under those managers' direction engaged in fraudulent practices that systematically inflated paid circulation numbers for Hoy New York from approximately 2001 until July 2004, Hoy Chicago from approximately September 2003 until July 2004, and Hoy Los Angeles from approximately March 2004 until July 2004 that were reported in Hoy's books and records and falsely represented to ABC that the inflated numbers were accurate. A goal of the scheme was to mislead ABC to verify by audit Hoy's false claims that its paid circulation was substantially increasing, and thereby to induce certain advertisers to pay higher rates than accurate reports by Hoy to ABC would have justified. A related goal upon the launching of Hoy Chicago in September 2003 and Hoy Los Angeles in March 2004 was to publish through ABC, false, as yet unaudited paid circulation data in order to convince potential advertisers that the success of these new editions justified buying advertising space in them.

4.     Among the fraudulent techniques used by Hoy managers and employees to inflate paid circulation numbers that they then reported to ABC was to falsify Hoy New York's records to

make it appear as if there were large numbers of paying subscribers for the newspaper, when in fact, few were actually paying to subscribe.

5.   Another fraudulent technique used by Hoy managers and employees to inflate paid circulation numbers that they then reported to ABC was to pay third party distributors of the Hoy Newspapers to accept and falsely to report as sold thousands more copies per day than the retail stores, hawkers and vending machines served by those distributors could actually sell.

6.   A related fraudulent technique used by Hoy managers to inflate paid circulation numbers that they then reported to ABC was to falsify and cause others, including Hoy employees and distributors of the Hoy Newspapers, to falsify "return affidavits" from the distributors documenting how many newspaper copies had been returned by retail stores and hawkers because they had not been sold.

Dated: December 12, 2007.

Dennis FitzSimons
Chairman & Chief Executive Officer
Tribune Company as sole owner of Hoy Publications, LLC

Thomas McC. Souther, Esq.
Counsel to Hoy Publications, LLC

Index No.   13469/10      Year

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

**GERARD SCHULTZ**
                    **Plaintiff,**
                              **-against-**
**NEWSDAY, INC.**
                    **Defendants.**

---

AMENDED VERIFIED COMPLAINT

---

**GIAIMO ASSOCIATES, LLP**
ATTORNEYS AT LAW
*Attorneys for* plaintiff
*Office and Post Office Address, Telephone*
80-02 Kew Gardens Road
Kew Gardens, New York 11415
(718) 261-6200

---

To                                          Signature (Rule 130-1.1-a)

_____

Attorney(s) for

---

Service of a copy of the with                    is hereby admitted.

Dated

_____
Attorney(s) for

---

Please take notice
☐ NOTICE OF ENTRY
that the within is a certified) true copy of a
duly entered in the office of the clerk of the within named court on
☐ NOTICE OF SETTLEMENT
that an order                              of which the within is a true copy will be presented for
settlement to the HON.                                              one of the judges of
the within named court, at        on        at        M

Dated,

To                                          Yours, etc.
                                    **GIAIMO ASSOCIATES, LLP**
                                          ATTORNEYS AT LAW
                                    *Attorneys for* plaintiff
Attorney(s) for                      *Office and Post Office Address, Telephone*
                                    80-02 Kew Gardens Road
                                    Kew Gardens, New York 11415
                                    (718) 261-6200